UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

RD-6665

MARTIN TANKLEFF,

                Plaintiff,                              CV-09-1207 (JS) (WDW)

THE COUNTY OF SUFFOLK,
K. JAMES MCCREADY, NORMAN REIN ,
CHARLES KOSCIUK, ROBERT DOYLE,
JOHN MCELHONE, JOHN DOE POLICE
OFFICERS #1-10, RICHARD ROE
SUFFOLK COUNTY EMPLOYEES #1-10,

                Defendants.

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF RULE 12(C)**

Dated:  Hauppauge, New York
       April 6, 2010

                                 CHRISTINE MALAFI
                                 Suffolk County Attorney
                                 Attorney for Defendants
                                    COUNTY OF SUFFOLK, K. JAMES
                                    McCREADY, NORMAN REIN,
                                    CHARLES KOSCIUK, ROBERT
                                    DOYLE, and JOHN MCELHONE
                                 100 Veterans Memorial Highway
                                 P.O. Box 6100
                                 Hauppauge, New York 11788

                By:    Richard T. Dunne (RD-6665)
                          Assistant County Attorney

## PRELIMINARY STATEMENT

Plaintiff Martin Tankleff (hereinafter "plaintiff" or "Tankleff") brings this action, pursuant to 42 U.S.C. §1983 ("§1983"), against defendants County of Suffolk, Retired Detective K. James McCready ("Detective McCready"), Retired Detective Norman Rein ("Detective Rein"), Retired Detective Charles Kosciuk ("Detective Kosciuk"), Detective Robert Doyle ("Detective Doyle") and Retired Detective Lieutenant John McElhone ("Detective McElhone"), (collectively "defendants"), alleging that he was wrongfully convicted of the murder of his parents. His complaint asserts claims for, *inter alia*, false arrest, malicious prosecution, violation of plaintiff's 4th, 5th, 6th and 14th Amendment rights, as well as purported *Miranda* and *Brady* violations.

Defendants submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure (hereinafter "Rule") 12(c), for judgment on the pleadings dismissing plaintiff's complaint. The relevant facts are set forth in Defendants' Affirmation in Support of its Motion pursuant to Federal Rules of Civil Procedure 12(c) submitted in support of the instant motion and are adopted as if more fully set forth herein. The facts therein are taken from the allegations set forth in the complaint or documents referred to in the complaint, incorporated by reference into the complaint, integral to the complaint, or legal decisions in related proceedings of which this Court must take judicial notice. All references to exhibits in this memorandum of law are to the exhibits attached to the aforesaid affirmation.

## STANDARD GOVERNING RULE 12(c) MOTION

The applicable legal standard for a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss for failure to state a claim. King v. American Airlines, Inc., 284 F.3d 352, 356 (2d Cir. 2002). On a Rule 12(b)(6) or Rule 12(c) motion, the Court is confined to consideration

of the facts as stated in the complaint, any documents which are attached to the complaint, and any documents which are incorporated by reference into the complaint.  *See* Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996).  The Court may consider documents annexed to the complaint or incorporated by reference into the complaint without converting the motion into a motion for summary judgment.  Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  Additionally, on a Rule 12(c) motion, the court may consider matters of which judicial notice may be taken, as well as any documents on which the plaintiff relied in bring suit.  Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999); Acot v. New York Medical College, 153 F.R.D. 517, 521 (S.D.N.Y. 1993), *quoting* Brass v. American Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993).  The County is also cognizant that the court may treat this as a motion for summary judgment, pursuant to Rule 56.1.  Fed. R. Civ. P. 12(c).  *See* Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000); Chambers, 282 F.3d at 154.

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (reversing the Second Circuit's decision in Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Id*. Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal citations and quotations omitted). Examining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 1950. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint fails to state a claim. *Id*. The plaintiff's factual allegations, in short, must show that the plaintiff's claim is "plausible," not merely "conceivable." *Id*. at 1951.

In applying the plausibility standard set forth in Twombly and Iqbal, a court "assume[s] the veracity" only of "well-pleaded factual allegations," and draws all reasonable inferences from such allegations in the plaintiff's favor. *Id*. at 1950. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not survive a motion to dismiss. *Id*. at 1949. Pleadings that "are no more than conclusions," "are not entitled to the assumption of truth." *Id*. at 1950.

Application of the Iqbal standard of review governing a motion to dismiss the complaint demonstrates that it is insufficient to withstand defendants' motion to dismiss.

## POINT I

## PLAINTIFF'S CLAIMS ARE BARRED BY COLLATERAL ESTOPPEL

The crux of Tankleff's claims of purported constitutional deprivations focus on his assertion that his 4th, 5th and 14th Amendment rights were violated by the manner in which his confession was obtained, and that the prosecution improperly withheld exculpatory evidence from him at his criminal trial. More specifically, Tankleff claims, as he has repeatedly argued

since his trial twenty years ago for the murder of his parents, that (1) his confession was involuntary, (ii) the police secured same in violation of his 5th and 14th Amendment rights, as well as his rights secured by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and (iii) that his confession was the result of an illegal police-orchestrated ruse.  Tankleff also alleges, as he has argued before, that his due process rights were violated because the prosecution was aware of, but failed to disclose, evidence that, prior to the murder of Tankleff's parents, Jerry Steuerman ("Steuerman"), Seymour Tankleff's former business partner, had threatened other people with whom Steuerman did business.  In a related vein, Tankleff maintains that the police investigation of Steuerman as a suspect was inadequate.  Defendants will show here that Tankleff's claims that his confession was illegally obtained, as well as his claim of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) violations with respect to the prosecutions purported failure to disclose information pertaining to Steuerman, are barred by the doctrine of collateral estoppel.

Collateral estoppel prevents a party from relitigating issues in a subsequent litigation that were, or could have been, brought in a prior action.  A federal court must give a state court judgment the same preclusive effect that it would have in the courts of that state.  <u>Green v. Montgomery</u>, 219 F.3d 52, 55 (2d Cir. 2000).  Under New York law, collateral estoppel, or issue preclusion, applies "if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."  <u>Colon v. Coughlin</u>, 58 F.3d 865, 869 (2d Cir. 1995).  *See* <u>Sullivan v. Gagnier</u>, 225 F.3d 161, 166 (2d Cir. 2000); <u>Kaufman v. Eli Lilly & Co</u>., 65 N.Y.2d 449, 455 (1985).  Collateral estoppel applies to §1983 claims.  <u>Allen v. McCurry</u>, 449 U.S. 90 (1980); <u>Borum v. Village of Hemstead</u>, 590 F. Supp. 2d 376, 380-81 (E.D.N.Y. 2008).

On June 28, 1990, Tankleff was convicted in County Court of two counts of murder in the second degree with respect to his parents.  As plaintiff concedes in his complaint, Tankleff directly appealed his judgments of conviction to the Appellate Division - Second Department, as well as to the Court of Appeals.  Tankleff's conviction was affirmed by both courts.  *See* People v. Tankleff, 199 A.D.2d 550 (2d Dep't 1993); People v. Tankleff, 84 N.Y.2d 992 (1994).  Thereafter, Tankleff filed a writ of habeas corpus in the United States District Court for the Eastern District of New York, which was denied.  Tankleff v. Senkowski, 993 F. Supp. 151 (E.D.N.Y. 1997).  The denial of Tankleff's writ of habeas corpus was affirmed by the Second Circuit insofar as the present claims are concerned.  Tankleff v. Senkowski, 135 F. 3d 235 (2d Cir. 1998).  Defendants submit that collateral estoppel precludes relitigation of the issues that were litigated in the direct appeal from Tankleff's conviction, as well as the issues raised in the habeas corpus proceeding.  *See* Kulak v. City of New York, 88 F.3d 63, 71-72 (2d Cir. 1996).

Subsequent to the aforesaid proceedings, Tankleff moved, pursuant to New York Criminal Procedure Law ("CPL") §440, to vacate the murder convictions on the grounds of newly-discovered evidence and actual innocence.  The County Court denied the motion.  On appeal, the Appellate Division, Second Department: (i) granted that portion of Tankleff's motion seeking to vacate the judgments based upon newly-discovered evidence, (ii) vacated the judgments, and (iii) remitted the matter for a new trial.  People v. Tankleff, 49 A.D.3d 160, 162 (2d Dep't 2007).  Thereafter, the Suffolk County District Attorney's Office, following a special investigation by the New York State Office of the Attorney General (hereinafter "Attorney General"), moved to dismiss the indictments in the interest of justice.  That motion was granted by order dated July 22, 2008.  (Exhibit RR)

Tankleff repeatedly asserts in his complaint herein that his confession was coerced, and that his interrogation was unconstitutional. Specifically, plaintiff's complaint alleges, in pertinent part, as follows:

Count I - that defendants McCready, Rein and John Doe police officers, fabricated or coerced a confession that they falsely attributed to Tankleff, in violation of his 4th and 14th Amendment rights (Exhibit TT, ¶¶ 147, 148, and 151);

Count II - defendants McCready and Rein fabricated evidence by feeding Tankleff the details of the crimes as they understood them and then misrepresented to prosecutors that those details had originated with plaintiff and this fabrication of evidence violated Tankleff's 14th Amendment rights to a fair trial and resulted in this wrongful conviction, *Id.*, ¶¶ 152-56;

Count III - McCready lied to prosecutors about not having a prior relationship with Steuerman and deliberately steered the investigation away from him in violation of Tankleff's 4th and 14th Amendment, *Id.*, ¶ 158;

Count V - Defendants McCready, Rein and John Doe police officers engaged in a deliberate course of lies, trickery and deceit in a custodial interrogation that induced Tankleff to adopt the detectives' version of events and falsely incriminate himself in violation of his 5th Amendment right (*Id.*, ¶ 164), as well as in violation of his 6th Amendment rights to counsel, *Id.*, ¶ 165;

Count IX - Defendants intentionally withheld from and misrepresented to prosecutors facts vitiating probable cause against Tankleff, including the fact that Tankleff's confession was the product of coercion and fabrication; giving rise to a state claim for malicious prosecution, *Id.*, ¶¶ 185-88, and

Count XI - Defendants McCready and Rein's deliberate conduct in coercing and fabricating a false confession constitutes intentional or negligent infliction of emotional distress, *Id.*, ¶¶ 192-93.

Tankleff's allegations regarding the alleged unconstitutional improprieties associated with his interrogation and confession, as well as his claims of purported *Miranda* violations, have previously been asserted, raised and litigated in his direct appeal from his conviction and in his habeas corpus proceedings. As such, Counts I, II, III, V, IX and XI of plaintiff's complaint must be dismissed as the issues raised therein are barred by the doctrine of collateral estoppel.

6

At issue in the direct appeal from Tankleff's convictions were whether Tankleff's confession, and McCready's stratagem undertaken to extract Tankleff's confession, violated Tankleff's privilege against self incrimination under the Federal and New York State Constitution, or otherwise violated Tankleff's *Miranda* rights.  The Second Department held that no such violations occurred.  Tankleff, 199 A.D.2d at 552.  This finding was thereafter upheld by the New York State Court of Appeals.  Tankleff, 84 N.Y. 2d at 994.  Specifically, Detective McCready's use of a ruse to provoke the confession was found to neither violate Tankleff's *Miranda* rights, or require suppression of the confession, and "was, in short, not so fundamentally unfair as to have deprived the defendant of his due process rights."  Tankleff, 199 A.D.2d at 552-53.  In affirming the Second Department's finding that there was no violation of Tankleff's *Miranda* rights, and that Tankleff's confession was "voluntarily given and that his will had not been overborne by any actions by the police," the Court of Appeals agreed that Tankleff had not been denied any due process rights and that his confession was properly admitted in the lower court.  Tankleff, 84 N.Y. at 994.

After Tankleff's murder convictions were affirmed on appeal, Tankleff sought federal habeas corpus relief.  Once again, Tankleff claimed that his confession was obtained in violation of his 14th Amendment rights because he was allegedly in a custodial interrogation, was not given his *Miranda* warnings in a timely fashion, and his statements were allegedly not voluntary.  Tankleff, 993 F. Supp. at 155.  The Eastern District concluded that Tankleff's confession was properly admitted at trial, and that he was not entitled to any *Miranda* warnings prior to his inculpating admissions because he was not subjected to a custodial interrogation.  The Eastern District further held that Tankleff's confession was voluntary and, therefore, his 14th Amendment rights were not violated.  *Id*. at 155-56.  In so holding, the District Court noted that Tankleff

"was a sophisticated and above average high school student who was considering entering college at the time of the murders.  Moreover, there was no credible evidence of physical and psychological coercion which would have overborne petitioner's will and rendered his statements involuntary."  *Id*.

Tankleff's appeal to the Second Circuit of the denial of his writ of habeas corpus was ultimately unsuccessful with respect to his claim that his confession was improperly obtained. Tankleff, 135 F.3d 235.  Once again, Tankleff argued that his confession should have been suppressed because it was allegedly involuntary, and obtained in violation of his 5th Amendment and *Miranda* rights.  While the Second Circuit did find that Tankleff was entitled to *Miranda* warnings at some point prior to the time that he was actually given such warnings, that Court ultimately determined that Tankleff's "second" *Mirandized* confession was properly admitted at his trial because, *inter alia*, "there is no indication in the record that Tankleff did not understand his rights once he was given the warnings or that his subsequent waiver of those rights was anything but knowing and voluntary."  135 F.3d at 245.  As the foregoing demonstrates, issues regarding the propriety of McCready's questioning of Tankleff, the legality of the ruse or strategum employed by the detectives, as well as the voluntariness and admissibility of Tankleff's confession, have been litigated no less than four times, each time resulting in a finding against Tankleff.  Accordingly, Tankleff's present claims regarding constitutional violations with respect to the manner in which his confession was obtained are barred by the doctrine of collateral estoppel.

Notably, in his motion for a new trial, pursuant to CPL §440, based upon newly-discovered evidence, Tankleff again argued that his *Miranda* rights were violated because he was allegedly in custody prior to the time that he was actually given his *Miranda* warnings.  *See*

Tankleff, 49 A.D.3d at 290; *see also* Reply Brief of Defendant-Appellant, People v. Tankleff, pp. 68-74, reproduced at 2007 WL 4297789 (July 10, 2007).  While the Second Department, on appeal, granted Tankleff's motion for a new trial based upon newly-discovered evidence, it specifically held that it would not "revisit" Tankleff's *Miranda* arguments "because the *Miranda* aspects of this case have been extensively litigated."  Tankleff, 49 A.D.2d at 182.

Tankleff's conclusory claim that defendants refused to investigate obvious leads, and suppressed exonerating and impeaching evidence in violation of *Brady*, as well as Tankleff's claim that the detectives failed to adequately investigate Steuerman as a suspect, are also barred by the doctrine of collateral estoppel.  These claims, as well as Tankleff's claim that defendants improperly withheld exculpatory evidence in that Detective McCready allegedly was aware that Steuerman had previously threatened business associates (Exhibit TT, ¶ 19), were litigated and resolved against Tankleff in his habeas corpus proceeding.  Tankleff, 993 F. Supp at 157-58; *see also* Tankleff, 135 F.3d at 250-51.  In this regard, the Second Circuit acknowledged these claims and specifically noted that Tankleff's attorney undermined Steuerman's credibility at trial, and cross-examined Detective McCready regarding his failure to pursue Steuerman as a suspect.  *Id*.  The factually unsupported, conclusory allegations that defendants failed to fully and properly investigate Steuerman as a suspect, as well as other leads, are insufficient to survive defendants' motion to dismiss, and are further belied in the report issued by the New York State Commission of Investigation (SIC) (Exhibit SS).  As such, Tankleff may not relitigate these alleged *Brady* violations.

In light of the fact that Tankleff has previously, and unsuccessfully, litigated the issues raised in Counts I, II, III, V, IX and XI of his complaint, those counts must be dismissed as barred under the doctrine of estoppel.

**POINT II**

**PLAINTIFF'S CLAIMS FOR MALICIOUS PROSECUTION,
FALSE ARREST AND FALSE IMPRISONMENT MUST BE DISMISSED**

Plaintiff's complaint alleges both a Federal §1983 and New York State claim for malicious prosecution.  (Exhibit TT, Counts I & IX)  As previously demonstrated in Point I *supra*, Tankleff's malicious prosecution claim must be dismissed on collateral estoppel grounds in that the basis for the claim; the allegedly improperly obtained confession, has been previously litigated and resolved against Tankleff.  Defendants will demonstrate here a separate and independent basis to dismiss Tankleff's malicious prosecution claims, as well as his claims for false arrest.

A §1983 malicious prosecution claim alleging deprivation of 4th and 14th Amendment rights, as well as a malicious prosecution claim brought under New York State law, requires a showing: (1) that the defendant commenced a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding, and (4) that the defendant acted with actual malice.  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003); Rohman v. N.Y. City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000). *See* Colon v. City of New York, 60 N.Y.2d 78, 82 (1983).  Plaintiff's malicious prosecution claim fails here because he cannot establish (1) a lack of probable cause, (2) a termination of the proceedings in his favor, or (3) that defendants acted with actual malice.

The dismissal of the criminal charges against Tankleff does not constitute a favorable termination sufficient to establish that element of plaintiff's malicious prosecution claim.  In his complaint, and in support of his malicious prosecution claims, plaintiff alleges that the Appellate Division, Second Department, vacated his convictions.  Reference to the Second Department order reveals that the basis for vacating Tankleff's convictions was on the grounds of newly

discovered evidence. Tankleff, 49 A.D.3d at 183.  Significantly, the Second Department affirmed the lower court's denial of Tankleff's CPL §440 motion to vacate the judgments of conviction on the grounds of actual innocence, holding that Tankleff "did not establish entitlement to this relief." Id. at 182.  Nor did the Second Department dismiss the case against plaintiff.  Rather, the judgments were vacated and the criminal matters against Tankleff were remitted for a new trial.  49 A.D.3d at 183.

Thereafter, as plaintiff's complaint specifically alleges, the Attorney General's office conducted an investigation of the murders of Tankleff's parents.  (Exhibit TT, ¶ 134)  Following that investigation, the Attorney General's office moved to dismiss the outstanding charges against Tankleff, pursuant to CPL §210.40, "in the interest of justice," and that motion was granted by the Supreme Court, Suffolk County.  Id., ¶¶ 136-37.

The Attorney General did not focus on whether Tankleff committed the crimes charged but, rather, on whether there was sufficient evidence ultimately to convince a jury of the defendant's guilt beyond a reasonable doubt.  (Exhibit WW, p. 2)  Addressing the evidence against Tankleff, the Attorney General's office noted that its:

> [i]nvestigation yielded the following evidence supporting a case against Tankleff.  His parents were found dead or fatally wounded in their house in early morning of September 7, 1988; there was no sign of a break-in or of a robbery, and the defendant, who was the only other person in the house, was unharmed.  The defendant was the beneficiary of this parents' wills, and just days before the murders he had made references to friends of the benefits that he would enjoy were his parents to die.  The defendant made vague but incriminatory statements to a family member and direct confessions to some fellow inmates in prison, and he gave a confession to the police, which he later disavowed.

Id., p. 4.  Ultimately, the Attorney General's basis for moving to dismiss the indictments was that evidentiary issues and changes in the law since the first trial would likely make it difficult to prove Tankleff's guilty beyond a reasonable doubt.  Id., pp. 2, 4-5, 8-11.

Whether a dismissal in the interests of justice, such as Tankleff obtained, constitutes a favorable termination sufficient to establish one of the requisite elements of a malicious prosecution claim is a question which requires a case-by-case analysis. *See* Cantalino v. Danner, 96 N.Y.2d 391, 396 (2001). A dismissal in the interest of justice that "leaves the question of guilt or innocence unanswered" generally may not be considered a favorable termination. Hankins v. Great Atlantic and Pacific Tea Co., 208 A.D.2d 111, 114 (1st Dep't 1995).

The reason that the Attorney General's office recommended dismissal of the indictments against Tankleff was not due to a belief that Tankleff was actually innocent but, rather, because of perceived difficulties, some twenty years after the crime, in the Attorney General's office's ability to prove Tankleff's guilt beyond a reasonable doubt. (*See* Exhibit WW) Similarly, the decision and order of the State Supreme Court granting the Attorney General's motion to dismiss was not based upon a finding that Tankleff was innocent of the crimes he had been charged with committing. (*See* Exhibit RR)

Simply stated, this is not a case where the criminal charges were dismissed because those charges were "unfounded." *See* Cantalino, 96 N.Y.2d at 396.

> A criminal defendant has not obtained a favorable termination of a criminal proceeding where the outcome is inconsistent with the innocence of the accused. While a plaintiff need not prove actual innocence in order to satisfy the favorable termination prong of a malicious prosecution action (Smith-Hunter v. Harvey, 95 N.Y.2d 191, 1999, 712 N.Y.S. 2d 438, 734 N.E. 2d 750 [2000], the absence of a conviction is not itself a favorable termination. A termination is not favorable, for example, where a prosecution ends because of a compromise with the accused, or where the accused's own misconduct frustrates the prosecution's ability to proceed with the case (*See, e.g.,* Cantalino-Danner, 96 N.Y.2d 391, 395, 729 N.Y.S. 2d 405, 754 N.E. 2d 164 [2001]. Plaintiff's felony conviction was reversed not because of her lack of culpability – indeed, her guilt was proven beyond a reasonable doubt – but because the evidence that formed the basis for her conviction was obtained pursuant to a faulty search warrant. There is plainly no favorable termination here for purposes of malicious prosecution.

Martinez v. City of Schenectady, 97 N.Y.2d 78, 85 (2001). At bar, Tankleff's convictions were not set aside due to his lack of culpability. Rather, his conviction was set aside on the grounds that newly discovered evidence entitled him to a new trial, and changes in the law since the first trial were thought to make it more difficult to prove his guilt at a new trial beyond a reasonable doubt. Moreover, Tankleff joined in the motion to dismiss the charges in the interest of justice, (*see* Exhibit RR), thereby resulting in the end of his prosecution due, in part, to a compromise with the accused. As such, it is submitted that plaintiff's malicious prosecution claims must fail because he cannot establish that he obtained a favorable termination.

A separate and independent basis to dismiss Tankleff's federal and state malicious prosecution claims is on the grounds that probable cause existed to both arrest Tankleff and, thereafter, indict him. *See* Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). Tankleff's concedes that he was indicted by a grand jury for the crimes charged (Exhibit TT, ¶¶ 106-109), which prevents him from establishing the probable cause element of his malicious prosecution claims. Colon, 60 N.Y. 2d at 82. As previously noted, one of the necessary elements of a malicious prosecution claim is lack of probable cause for commencing the criminal proceeding against the plaintiff. Jocks, 316 F.3d at 134. For malicious prosecution purposes, the determination of probable cause is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated; i.e., the date of presentment to the grand jury as opposed to the time of the arrest. Drummond v. Castro, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007); Carson v. Lewis, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999). The necessary probable cause is defined as "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." Colon, 60 N.Y.2d at 82. A grand jury indictment creates the presumption that the accused's arrest and indictment were procured with probable

13

cause, and it is the plaintiff's burden to overcome that presumption with evidence that

defendants engaged in fraud, perjury, the suppression of evidence beneficial to the accused, or

other police conduct undertaken in bad faith.  Bernard v. U.S., 25 F.3d 98, 104 (2d Cir. 1994).

"Mere conjecture and surmise that an indictment was procured as a result of conduct undertaken

by defendants in bad faith cannot overcome the presumption of probable cause created in an

indictment."  Gil v. County of Suffolk, 590 F. Supp. 2d 360, 369 (E.D.N.Y. 2008).

The standard to determine whether probable cause existed both for the arrest, and an

indictment following the arrest, is reasonableness or objectivity.  *See* Lennon v. Miller, 66 F.3d

416, 424 (2d Cir. 1995); Simons v. New York, 472 F. Supp. 2d 253,263 (N.D.N.Y. 2007).  The

prior judicial opinions issued herein, as well as the analysis by the Attorney General's office

regarding the evidence available at the time of the arrest and trial, provide ample objective

evidence that there was probable cause to arrest Tankleff for the crimes charged and, thereafter,

to indict Tankleff on murder charges.

As plaintiff concedes in his complaint, after the Second Department set aside Tankleff's

convictions and ordered a new trial, the Attorney General's office was brought in to serve as a

special prosecutor to investigate the murders.  It can be fairly stated that the Attorney General's

office was called in as special prosecutor in order to avoid even the appearance of a conflict of

interest.  The Attorney General's memorandum of law submitted in support of its motion to

dismiss the charges against Tankleff, in the interest of justice, noted that its investigation

revealed the following evidence supporting a case against Tankleff:

> His parents were found dead or fatally wounded in their house in early morning of
> September 7, 1988; there was no sign of a break-in or of a robbery, and the defendant,
> who was the only other person in the house, was unharmed.  The defendant was the
> beneficiary of this parents' wills, and just days before the murders he had made
> references to friends of the benefits that he would enjoy were his parents to die.  The
> defendant made vague but incriminatory statements to a family member and direct

confessions to some fellow inmates in prison, and he gave a confession to the police, which he later disavowed.

(Exhibit WW, p. 4)

An objective view of the evidence, as was more fully delineated in the affirmation submitted in support of the instant motion, also incontrovertibly establishes the following:

**Evidence At Scene**

- although Tankleff told the Detectives at the scene that he had used the phone in his father's office to call 9-1-1, the blood spatter on the phone had not been disturbed;

- although Tankleff told the Detectives at the scene that he rendered aid to his father, who had blood gushing out of his neck wound, no blood was observed on plaintiff's clothing;

- although Tankleff stated to Detectives at the scene that, after rendering aid to his father, he then checked the garage, there was no blood on the door handle to the garage, or the dead bolt on the garage door, which was locked;

- Tankleff stated to Detectives at the scene that he never entered his mother's bedroom, and observed from the door to the bedroom that her throat had been cut and that she was dead; however, Detectives at the scene could not observe Arlene's injuries until they entered the bedroom and stood directly over her;

- Tankleff stated to Detectives at the scene that, after rendering aid to his father, his hands were covered with blood, yet the phones in the kitchen, one of which Tankleff used to speak to his sister and a friend on four occasions, had no blood on them;

- Tankleff stated to Detectives at the scene that, after getting up, he first looked in his mother's bedroom, which was dark because the drapes were drawn, and he did not see anyone.  Yet when the Detectives inspected the scene they observed that the drapes in the master bedroom were open;

- Tankleff did not appear upset or emotional at the scene, and

- although his bedroom was directly across the hall from the master bedroom, Tankleff never claimed to have heard anything, although it appeared to Detectives at the scene that there had been a struggle in Arlene's bedroom.

**Evidence Obtained At Police Headquarters**

- at police headquarters, prior to his arrest, plaintiff informed the police that he was the primary beneficiary when his parents died;

15

- at police headquarters, prior to his arrest, as plaintiff was demonstrating how he gave first aid to his father, a detective observed blood on plaintiff's shoulder, beneath his sweatshirt;

- plaintiff was calm at police headquarters and did not exhibit any symptoms of shock at the violent attacks on his parents;

- at police headquarters, and prior to his arrest; plaintiff reiterated that after rendering aid to his father he was "covered with blood." Tankleff then claimed he put the sweatshirt on after the police arrived, but Tankleff had been observed wearing the sweatshirt when the police arrived, and

- Tankleff confessed to the crimes, including a detailed description of the injuries to the back of Arlene Tankleff's head that were not discovered or known to exist until two and a half hours after Detectives stopped questioning Tankleff.

**Evidence At Trial**

- Tankleff acknowledged at trial that he had confessed to the crime while he was at police headquarters.

Defendants' Affirmation in Support of Motion Pursuant to FRCP Rule 12(c) (hereafter "Defs. Aff."), ¶¶ 3-10, 15-20, 24, 42, 45, 49, 51, 77, 81, 181-83.

The aforesaid evidence would lead a reasonably prudent person to believe Tankleff committed the crimes with which he was charged. As such, there was probable cause sufficient to support Tankleff's arrest.

**Evidence After Arrest**

In addition to the foregoing, the evidence obtained following Tankleff's arrest and leading up to his indictment included the following, all of which establishes probable cause to indict:

- Arlene had injuries on the back of her head and back, which could not be observed at the crime scene until after she had been rolled over, which occurred after the Detectives took Tankleff's confession, which injuries were consistent with Tankleff's confession;

- after being arrested, Tankleff was heard telling his sister that he "acknowledged to the police that [he] did it;"

16

- examination of the crime scene revealed no sign of an intrusion;

- blood was observed on the door knob, light switch and wall near that switch in plaintiff's bedroom;

- the blood spatter on the phone in the office where Seymour was found had not been disturbed after the spattering;

- the watermelon knife found in the kitchen was not in the position that the card player, who had used the knife, described having placed it on the evening of the card game;

- Arlene's autopsy results were consistent with Tankleff's confession as to how he killed his mother, and

- those in attendance at the card game did not observe any problems at the game between any of the players including Steuerman and Seymour.

*Id.*, ¶¶ 28, 96 - 99, 101 - 111.

The foregoing establishes, overwhelmingly, that there was probable cause to indict

Tankleff, which requires dismissal of his malicious prosecution claims.  <u>Savino</u>, 331 F.3d at 72.

Significantly, despite Tankleff's continued protestation that he was improperly "coerced" into

giving a false confession, the Second Department, in upholding Tankleff's convictions,

implicitly, if not explicitly, found that there was sufficient basis for objective police officers and

thereafter, prosecutors, to rely on Tankleff's confession:

> it is clear to us that the type of trickery employed by Detective McCready in this case was not likely to provoke an unreliable confession; on the contrary, we find that the factual reliabililty of the defendant's confession was, if anything, enhanced by the nature of the particular ploy which was used to elicit it. Needless to say, we give no credence to the defendant's claim that he confessed because he was "brainwashed."

<u>Tankleff</u>, 199 A.D.2d at 553, *aff'd*. 84 N.Y.2d 922 (1994).  *See also* <u>Tankleff</u>, 993 F. Supp. at

156 ("Petitioner was a sophisticated and above average high school student who was considering

entering college at the time of the murders.  Moreover, there is no credible evidence of physical

or psychological coercion which could have overborne petitioner's will and rendered his statements involuntary.")

Finally, there is nothing more than conclusory allegations, bereft of factual support, that any alleged misconduct by defendants herein was intentional or motivated by actual malice, another necessary element of a malicious prosecution claim, which further supports dismissal of Tankleff's malicious prosecution claim. Inasmuch as the evidence, both at the time of the arrest, and at the time of the indictment, was sufficient to establish probable cause, plaintiff's malicious prosecution claims, asserted in Counts I and IX of the complaint, must be dismissed.

Similarly, probable cause serves to bar Tankleff's state and federal §1983 claim for false imprisonment/arrest asserted in Count X of the complaint. Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). A claim for false arrest is the same as a claim of false imprisonment. *See* Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991); *see* Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995). The elements of a false imprisonment/arrest claim are that: (i) that defendant intended to confine plaintiff; (ii) that plaintiff was conscious of the confinement; (iii) that plaintiff did not consent to the confinement, and (iv) the confinement was not otherwise privileged. Martinez, 97 N.Y.2d 78; Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997); Singer, 63 F.3d at 118. Probable cause for the arrest is a complete defense to an action alleging false arrest. Singer, 63 F.3d at 118; Escalera, 361 F.3d at 743; Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002).

Significantly, once probable cause to arrest is established, the police do not have to endeavor to negate it. Baker v. McCollan, 443 U.S. 137, 146 (1979); Carson v. Lewis, 35 F. Supp. 2d 250, 261 (E.D.N.Y. 1999); Drummond, 522 F. Supp. 2d at 673-74. Moreover, once probable cause to arrest and charge the accused exists, there is no basis for either a false arrest or

malicious prosecution claim under either federal or New York State law.  <u>Singer</u>, 63 F.3d at 118;

<u>Murphy</u>, 118 F.3d at 947.

In determining whether there was probable cause to arrest, the focus is on the facts

available to the police officer at the time of, and immediately prior to, the arrest.  <u>Caldarola</u>, 298

F.3d at 162; <u>Singer</u>, 63 F.3d at 119.  As previously noted, an objective view of the evidence

available at the time of the arrest reveals the following, *inter alia,* plaintiff's "parents were found

dead or fatally wounded in their house," "there was no sign of a break-in or of a robbery, and the

defendant, who was the only other person in the house, was unharmed."  (Exhibit WW, p. 4)

Moreover, Tankleff confessed to the police.  *Id*.  Although he later "disavowed" that confession,

judges in both the state and Federal courts found his statements voluntary.  *See* <u>Tankleff</u>, 199

A.D.2d at 553; <u>Tankleff</u>, 993 F. Supp. at 156.  The foregoing evidence would support a person of

reasonable caution to believe that Tankleff committed the crimes for which he was arrested.

<u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996).  As such, probable cause existed for

Tankleff's arrest, and the existence of same bars plaintiff's state and Federal §1983 claim for

false imprisonment/arrest.  Accordingly, Count X of plaintiff's complaint must be dismissed.

**Qualified Immunity**

Establishing probable cause for plaintiff's arrest also provides the defendant police

officers with a qualified immunity defense to plaintiff's claims.  Qualified immunity protects law

enforcement officials from "liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known" (<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)), or insofar as it was objectively

reasonable for them to believe that their acts did not violate those rights.  <u>Zellner v. Summerlin</u>,

494 F.3d 344, 367 (2d Cir. 2007); <u>Anderson v. Creighton</u>, 483 U.S. 635, 638-39 (1987).  It has

been emphasized that it is important to resolve immunity questions at the earliest stage in the litigation. Saucier v. Katz, 533 U.S. 194 (2001); Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002). "The basic thrust of the qualified immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'" Iqbal, 129 S. Ct. 1953, *quoting* Siegert v. Gilley, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring in judgment). Significantly, when a plaintiff alleges a violation of constitutional rights, and a defendant official asserts the defense of qualified immunity to the §1983 claim, the Supreme Court has recently overruled the mandatory "ordering of issues" approach previously imposed by Saucier, (533 U.S. 194), which required that a court resolving a qualified immunity claim to first determine if the complaint stated a violation of federal law. In Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court held that when a defendant official asserts the defense of qualified immunity to a §1983 claim, a court has discretion either to first decide whether the complaint states a violation of a federal constitutional right or, alternatively, to proceed directly to the qualified immunity issue of whether the defendant violated clearly established federal law.

A police officer is entitled to qualified immunity where his conduct does not violate clearly established statutory or constitutional rights to which a reasonable person would have known (Caldarola, 298 F.3d at 160, *quoting* Anderson, 483 U.S. at 640), or it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act. Martinez v. Simonetti, 202 F.3d 625, 633 (2d Cir. 2000). In a case alleging false arrest, qualified immunity exists where the defendant police officer had "arguable probable cause" to arrest. Caldarola, 298 F.3d at 162; Lennon, 66 F.3d at 423-24. Thus, even if it is determined that probable cause was lacking, an arresting officer entitled to immunity from suit if he can establish

that there was "arguable probable cause" to make the arrest.  <u>Escalara v. Lunn</u>, 361 F.3d 737, 743 (2d Cir. 2004); <u>Caldarola</u>, 298 F.3d at 166.

Having previously established that there was probable cause to arrest Tankleff, and thereafter indict him, that same probable cause determination also results in a concomitant finding that defendants are entitled to dismissal of plaintiff's federal and state claims of false arrest/imprisonment and malicious prosecution based upon the defense of qualified immunity. *See* <u>Carson</u>, 35 F. Supp. 2d at 261-62; <u>Martinez</u>, 202 F.3d at 636; <u>Curley v. Village of Suffern</u>, 268 F.3d 65 (2d Cir. 2001).

**POINT III**

**PLAINTIFF'S 14TH AMENDMENT
RIGHTS WERE NOT VIOLATED AND
COUNTS III AND IV OF COMPLAINT MUST BE DISMISSED**

Other than vehemently reiterating his twenty-year diatribe that his confession was coerced, the only substantive claim relating to the criminal trial raised herein that was not previously litigated is Tankleff's claim that the defense improperly withheld exculpatory material relating to the alleged imprint of a bloody knife on Arlene Tankleff's sheets.  (Exhibit TT, Count IV)

Specifically, Count III of Tankleff's complaint alleges a purported §1983 claim for failure to investigate "obvious and known exculpatory leads," and Count IV of the complaint alleges a §1983 claim premised upon an alleged violation of Tankleff's 14th Amendment right in that defendants McCready and Rein purportedly failed to disclose "the truth about how they elicited the so-called confession" (*Id.* ¶ 160).  This allegation has been previously litigated and the basis for its dismissal was set forth in Point I, *supra*.  Count IV of Tankleff's complaint further alleges that defendants Kosciuk and McCready:

21

> deliberately chose not to disclose to prosecutors evidence that investigators found an imprint of a bloody knife – a knife other than the watermelon knife that was the murder weapon in the so-called confession – on Arlene Tankleff's sheets.  The watermelon knife McCready and Rein believed Mr. Tankleff used as the murder weapon had no traces of blood on it.  Evidence of a different bloody knife, a knife that was not found in the house, was material.

*Id*. ¶ 161.  Defendants will demonstrate that they properly disclosed all evidence that they had regarding the bloody sheet.  Therefore, there was no violation of Tankleff's 14th Amendment rights, and Counts III and IV of the complaint must be dismissed.

Preliminarily, the allegation that defendants Kosciuk and McCready "deliberately chose not to disclose to prosecutors that evidence that investigators found an imprint of a bloody knife" on Arlene Tankleff's sheet, is the type of "naked assertion[ ]," devoid of any "further factual enhancement," which should result in dismissal.  Twombly, 550 U.S. at 570.  Such conclusory assertions, unsupported  by factual content, are insufficient to withstand a motion to dismiss.  Iqbal, 129 S. Ct. at 1949-50.

Tankleff asserts that defendants Kosciuk and McCready withheld from the prosecution evidence that (i) a knife stain appeared on the bloody sheet, and (ii) that this stain was inconsistent with the watermelon knife which Tankleff confessed to using in the murders.  As such, plaintiff alleges that the prosecution violated its Federal and State constitutional duties to disclose exculpatory evidence, as espoused in Brady, 373 U.S. 83.

In order to establish a *Brady* violation, the party alleging the violation must show: (1) the prosecution failed to disclose evidence in its possession, (ii) the evidence was favorable to the defense, either because it is exculpatory, or it is impeaching, and (iii) the failure to disclose resulted in prejudice.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); U.S. v. Gil, 297 F.3d 93, 101 (2d Cir. 2002); People v. Fuentes, 12 N.Y.3d 259, 263 (2009).

The record here is abundantly clear that within five (5) weeks of the murders, and twenty (20) months before trial, Tankleff's defense attorney was in possession of the prosecution's analysis of Arlene Tankleff's bed sheets. Defs. Aff., ¶¶ 129-133. The prosecution's forensic scientist, Robert Bauman, conducted a forensic analysis of Arlene Tankleff's bedsheets and noted the "presence of staining" on the sheets, but did not opine that he saw a partial knife impression, or what the New York State Forensic Lab described, some twenty years after Tankleff's conviction, as "the presence of a partial impression pattern *which appears to be* knife-like in design" (Exhibit HH, emphasis supplied), on the bed sheets. Stated even more plainly, there was no evidence of any "partial impression pattern which appear to be knife-like in design" withheld from Tankleff because neither the detectives, nor the prosecution, ever noted any such evidence. *See* Smith v. Edwards, 2000 WL 709005 at *6 (S.D.N.Y. 2000) (prosecution cannot be found to have violated *Brady* for failing to disclose evidence it does not possess or of which it is not aware).

Further, Tankleff's defense attorney is on record that he was in possession of the analysis of the bloodstains undertaken by the prosecution. (Exhibit CC)  Significantly, Tankleff's defense attorney stated affirmatively that he "fully intended to undertake [his] own analysis if that is necessary" (Exhibit BB), thereby evidencing his acknowledgement of defendant's independent right to examine the bed sheets. Notably, Tankleff's defense attorney did not object to the introduction of the photographs of the bed sheets at trial, or to the admission of the actual bedsheets. Defs. Aff., ¶¶ 134–137.  Nor did he present any expert evidence suggesting the bedsheets had impression evidence of any sort. *Id.* at ¶ 137.

"Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." U.S. v. LeRoy,

687 F.2d 610, 618 (2d Cir. 1982) (citations omitted).  *Accord* U.S. v. Zagari, 111 F.3d 307, 320 (2d Cir. 1997) (no *Brady* violation where defense counsel knew of the existence of the evidence, which was equally available to defense counsel, but chose not to pursue it);  U.S. v. Middlemiss, 217 F.3d 112, 123 (2d Cir. 2000) (because defendants were already aware of the allegedly exculpatory evidence, they suffered no *Brady* violation).  The prosecution's obligation to disclose exculpatory or impeaching information under *Brady* is limited to that information which is then known to the prosecution.  U.S. v. Parks, 100 F.3d 1300, 1307 (7th Cir. 1996).  *Brady* does not place any burden on the government to conduct a defendant's investigation or assist in the presentation of the defense's case.  East v. Scott, 55 F.3d 996, 1003 (5th Cir. 1995).  Further, there is no due process requirement that the prosecution use any particular investigatory tool or perform any additional forensic testing.  Smith v. Edwards, 2000 WL 709005*6 (S.D.N.Y. 2000), citing Arizona v. Youngblood, 488 U.S. 51, 58-59 (1988).

Here, Tankleff's defense attorney knew that the bed sheet had blood stains on it, and was actually in possession of the prosecution's blood analysis of the stains.  As defense counsel advised the prosecution, he was fully cognizant of his right to examine the sheet itself if he so chose.  (Exhibit BB)  If the defense attorney felt so inclined, he had both sufficient time and opportunity to do his own investigative analysis as to whether the pattern or imprint of the blood stains were indicative of anything material to the defense.  There was simply no obligation on the part of the prosecution to perform further forensic testing on the bed sheet to establish whether there was any additional exculpatory evidence.  Arizona, 488 U.S. at 58-59; Smith, 2000 WL 709005 at *6.  The record here is devoid of any request by defense counsel for additional forensic testing to be done on the bed sheet, or any claim of prejudice at trial because

no further testing had been undertaken.  As such, no *Brady* violation occurred with respect to the bed sheet and Counts III and IV of the complaint must, therefore, be dismissed.

**POINT IV**

**PLAINTIFF'S CIVIL RIGHTS CONSPIRACY**
**CAUSE OF ACTION MUST BE DISMISSED**

Plaintiff asserts, in Count VI of the complaint, that, *inter alia*, the defendant police officers acted in concert in order to deprive plaintiff of his 4th, 5th, 6th, 8th and/or 14th Amendment rights.  (Exhibit TT, Count IV)  This claim is labeled as a §1983 Civil Rights conspiracy claim. Such "conclusory, vague or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights" must be dismissed.  Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  *See* Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009).  Tankleff's boilerplate allegations of conspiracy fail to satisfy the pleading requirements set forth in Iqbal in that Count VI of the complaint is devoid of any "well pleaded factual allegations…plausibly [giving] rise to an entitlement to relief."  Iqbal, 129 S. Ct. at 1950.

Moreover, as a matter of law, plaintiff cannot succeed on this cause of action.  All of the defendants named in Count VI of the complaint are specifically alleged to have been "acting within the [s]cope of their employment" as part of "Suffolk County law enforcement when they allegedly conspired together." (Exhibit TT, ¶ 167)  The alleged co-conspirators, as plaintiff concedes in the complaint, are co-employees; i.e., all of the defendants which purportedly conspired together are alleged to be members of the Suffolk County Police Department.  *Id*., ¶ 31-37.

This Court has held that the "intra corporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."  Daniel v. Long

25

_____., 2009 WL 702209 (E.D.N.Y. 2009).  The intra corporate conspiracy doctrine applies to a public entity and its employees, and provides grounds to dismiss a §1983 conspiracy claim.  <u>Malone v. City of New York</u>, 2006 WL 2524197 (E.D.N.Y. 2006). That is, a §1983 conspiracy claim cannot be maintained where the individual defendants are all employees of the institutional defendant.  <u>Celestin v. City of New York</u>, 581 F. Supp. 2d 420, 434 (E.D.N.Y. 2008).  Further, once it is established that there is probable cause to arrest and prosecute a plaintiff, there is no valid claim for conspiracy.  *Id*. at 435.

Inasmuch as plaintiff specifically alleges that the defendants were acting in the scope of their employment at the time of the alleged acts which form the basis of the purported conspiracy, the exceptions to the intra corporate conspiracy doctrine that apply when individuals within an entity are pursuing wholly personal motives and separate from the entity, are not applicable here. *See and cf*.  <u>Quinn v. Nassau County Police Dep't</u>., 53 F. Supp. 2d 347, 360 (E.D.N.Y. 1999); <u>Tardd v. Brookhaven Nat. Laboratory</u>, 407 F. Supp. 2d 404, 414 (E.D.N.Y. 2006).  The allegations of plaintiff's §1983 civil conspiracy cause of action confine themselves to alleging that defendants were acting within the scope of their employment with the County.  Exhibit TT, ¶ 167.

As such, pursuant to the intra corporate conspiracy doctrine, Count VI of plaintiff's complaint must be dismissed.

**POINT V**

**PLAINTIFF'S *MONELL* AND SUPERVISORY LIABILITY CLAIMS MUST BE DISMISSED**

Dismissal of the constitutional claims herein requires dismissal of Tankleff's *Monell* claims, as well as his claim premised upon supervisory liability.  *See* <u>Coleman v. City of New York</u>, 2010 WL 571986*1 (S.D.N.Y. 2010).

Tankleff's complaint alleges a §1983 *Monell* claim (Monell v. Dep't of Social Services, 436 U.S. 658, 690-91 (1978)); asserting that the County had an unconstitutional custom or policy of conducting inadequate and unconstitutional police investigations, and that the County failed to adequately train and supervise its police officers.  (Exhibit TT, Count VIII)   As previously established, none of Tankleff's claims that he suffered a deprivation of his constitutional rights as a result of any acts or omissions by the individually named defendants can succeed.  Where, as here, the plaintiff cannot establish that the plaintiff has suffered a constitutional injury due to the actions of police officers, there is no basis for a *Monell* claim.  Curley, 268 F.3d at 71; Amato v. City of Saratoga Springs, 170 F.3d 311, 320 (2d Cir. 1999).

Count VII of the complaint, alleging that Doyle, McElhone and Roe are liable under a theory of supervisory liability for their failure to supervise McCready and Roe, must also be dismissed.  In the first instance, the allegations of Count VII of the complaint are conclusory, and lack the factual content necessary to render them sufficiently plausible, as required under Iqbal to withstand a motion to dismiss.  Iqbal, 129 S.Ct. at 1949.

Nor can the allegations of the complaint survive the application of Iqbal on the merits with respect to the purported claim for supervisory liability.  In Iqbal, the Supreme Court held that vicarious liability is inapplicable to §1983 suits, requiring a plaintiff to plead that "each Government official defendant, through the official's own individual actions, has violated the Constitution."  Iqbal, 129 S.Ct. at 1948; *see also* 129 S.Ct. at 1958 (Souter, J. dissenting) (majority has eliminated doctrine of supervisory liability).  Allegations of mere "knowledge and acquiescence" by supervisors are insufficient.  *Id*. at 1949.  Moreover, to the extent that a §1983 claim of supervisory liability may survive Iqbal, (*see* Bridgewater v. Taylor, ___F. Supp. 2d___,

2010 WL 996154*4, FN4 (S.D.N.Y. 2010) (commenting that further guidance regarding liability for supervisory liability under §1983 is necessary after Iqbal, and noting that pre-Iqbal standard was more favorable to plaintiff)), even prior to Iqbal, in order for a supervisor to be found liable under a §1983 supervisory liability claim, the plaintiff needed to establish an underlying constitutional deprivation.  Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999).  Having previously established that all of Tankleff's claims of constitutional violations must be dismissed, Count VII of Tankleff's complaint must also be dismissed.

POINT VI

**TANKLEFF'S EMOTIONAL DISTRESS CLAIMS MUST BE DISMISSED**

Tankleff's final state claim seeks recovery for purported intentional and/or negligent infliction of emotional distress due to the alleged "deliberate conduct of defendants McCready and Rein in coercing and fabricating a false confession, refusal to investigate the obvious suspect, [and] cover-up of the trut[h]."  (Exhibit TT, Count XI)   Plaintiff's emotional distress claims must also be dismissed.

"Under New York law, a claim of intentional infliction of emotional distress ["IIED"] requires: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  Conboy v. AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (internal quotation marks omitted).  Where, as in the case at bar, the IIED claim is duplicative of the plaintiff's claims for false arrest and malicious prosecution, it must be dismissed.  Leonard v. Reinhardt, 20 A.D.3d 510 (2d Dep't 2008).

New York recognizes three kinds of claims for negligent infliction of emotional distress ("NIED"):  (1) cases premised on the breach of a duty owed by the defendant directly to the

plaintiff that either endangered plaintiff's physical safety or caused plaintiff to fear for his own safety, (2) cases where one who is himself threatened with bodily harm as a result of the defendant's negligence views the death or serious bodily injury of a member of his immediate family and suffers emotional distress, and (3) cases in which the defendant violates a duty to the plaintiff which causes physical harm to a third party but only financial or emotional harm to the plaintiff. Kennedy v. McKesson Co., 58 N.Y.2d 500 (1983). While McCready and Rein are alleged to have endangered Tankleff's physical safety or caused him to fear for his safety, as is necessary for Tankleff to succeed on a claim for NIED (see Gaylord v. Fiorella, 28 A.D.3d 713, 713-14 (2d Dep't 2006), and cases cited therein), Tankleff's conclusory claims in this regard merely mirror the elements of the cause of action, but are barren of even the hint of an allegation that either defendant physically threatened Tankleff, let alone actually injured him. These are precisely the type of allegations which must be dismissed under Iqbal. 129 S.Ct. at 1949-50. *See also* Stephens v. Shuttle Associates, L.L.C., 547 F. Supp. 2d 269, 275 (S.D.N.Y. 2008) (where plaintiff cannot establish that his physical safety was ever threatened or endangered by defendants, he cannot recover for NIED); Danielak v. City of New York, 2005 WL 2347095*18 (E.D.N.Y. 2005) (same).

Further, any claim for either IIED or NIED fails once probable cause to arrest and prosecute the plaintiff is established. Reinhart v. City of Schenectady Police Dept., 599 F. Supp. 2d 323, 335 (N.D.N.Y. 2009), *quoting* Csoka v. County of Suffolk, 85 F. Supp. 2d 117 (E.D.N.Y. 2000). Finally, there cannot be any recovery for a claim for NIED unless it is established that there was a special duty uniquely owed to the plaintiff. Kojak v. Jenkins, 1999 WL 244098*9 (S.D.N.Y. 1999); Kelly v. Chase Manhattan Bank, 717 F. Supp. 227, 235 (S.D.N.Y. 1995) (a terminated employee cannot maintain a NIED claim because the employer owed the same duties

to all employees). No such special duty is alleged in plaintiff's complaint, nor can Tankleff establish that either defendant McCready or Rein owed plaintiff a special duty.

Accordingly, plaintiff's State claims seeking to recover damages for either intentional or negligent infliction of emotional distress must be dismissed.

## **CONCLUSION**

Based upon the foregoing, defendants submit that plaintiff's complaint must be dismissed, pursuant to Federal Rules of Civil Procedure 12(c), together with such other and further relief as to this Court seems just and proper.

Dated: Hauppauge, New York
     April 6, 2010

Respectfully submitted,

CHRISTINE MALAFI
Suffolk County Attorney
Attorney for Defendants
    COUNTY OF SUFFOLK, K. JAMES
    McCREADY, NORMAN REIN,
    CHARLES KOSCIUK, ROBERT DOYLE,
    and JOHN MCELHONE
100 Veterans Memorial Highway
Hauppauge, New York 11788
(631) 853-4049

BY:      _____
       Richard T. Dunne (RD-6665)
       Assistant County Attorney