UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

═══════════════════════════════════════

MARTIN TANKLEFF,

                  Plaintiff,                CV-09-1207 (JS) (AYS)

THE COUNTY OF SUFFOLK, THERESA
and BRETT MCCREADY, as legal
successors of K. JAMES MCCREADY,
NORMAN REIN, CHARLES KOSCIUK,
ROBERT DOYLE, JOHN MCELHONE,
JOHN DOE POLICE OFFICERS #1-10,
RICHARD ROE, Suffolk County Employees
#1-10,

                  Defendants.

═══════════════════════════════════════

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
PURSUANT TO FED.R.Civ.P. RULE 56**

Dated:  Hauppauge, New York
       January 15, 2016

                           DENNIS M. BROWN
                           Suffolk County Attorney
                           Attorney for Defendants
                           COUNTY OF SUFFOLK, K. JAMES
                           McCREADY, NORMAN REIN,
                           CHARLES KOSCIUK, ROBERT
                           DOYLE, and JOHN MCELHONE
                           100 Veterans Memorial Highway
                           P.O. Box 6100
                           Hauppauge, New York 11788

                By:    Brian C. Mitchell
                           Assistant County Attorney

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF RELEVANT FACTS ........................................................ 2

STANDARD OF REVIEW .............................................................................. 3

ARGUMENT

POINT I

  PLAINTIFF'S CONFESSION WAS VOLUNTARY AND NOT COERCED AS
  A MATTER OF LAW ............................................................................ 4

POINT II

  PLAINTIFF'S MALICIOUS PROSECTION CLAIMS MUST BE DISMISSED
  AS THERE WAS PROBABLE CAUSE TO ARREST AND INITIATE THE
  PROSECUTION AGAINST HIM INDEPENDENT OF ANY ALLEGED
  FABRICATED EVIDENCE .............................................................. 17

POINT III

  PLAINTIFF'S CLAIM THAT DR. ADAMS TOLD DETECTIVES THERE
  WAS NO REASONABLE POSSIBILITY THAT THE WATERMELON KNIFE
  COULD HAVE BEEN USED IN THE CIRME IS UNSUPPORTED IN THE
  RECORD ......................................................................................... 28

CONCLUSION ................................................................................................ 33

i

## TABLE OF AUTHORITIES

*Albright v. Oliver,*
   510 U.S. 266 (1994)...............................................................................................19

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................................................3, 4

*Arizona v. Youngblood,*
   488 U.S. 51 (1988)...............................................................................................31

*Ashcroft v. al–Kidd,*
   563 U.S. 731, 131 S.Ct. 2074 (2011)....................................................................15

*Back v. Hastings on Hudson Union Free School Dist.,*
   365 F.3d 107 (2d Cir. 2004)..................................................................................29

*Betts v. Shearman,*
   751 F.3d 78 (2d. Cir. 2014)..................................................................................27

*Boyd v. City of New York,*
   336 F.3d 72 (2d Cir.2003)....................................................................................17

*Brosseau v. Haugen,*
   543 U.S. 194, 125 S.Ct. 596, (2004).....................................................................15

*Brown v. Eli Lilly & Co.,*
   654 F.3d 347 (2d Cir.2011)..................................................................................29

*Carrow v. City of New York,*
   No. 06 Civ. 1436, 2010 WL 1009996 (S.D.N.Y. Mar. 17, 2010) ...........................18

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed 2d 28  (1986)....................................3, 19, 26

*Chandok v. Klessig,*
   632 F.3d 803 (2d Cir.2011)..................................................................................19

*Colon v. New York,*
   60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983).....................................18

*Corbett v. Firstline Security Inc.,*
   687 F.Supp.2d 124 (E.D.N.Y., 2009) ......................................................................4

*DiBlasio v. City of New York*,
    102 F.3d 654 (2d Cir. 1996)................................................................26

*Dickerson v. Napolitano,*
    604 F.3d 732 (2d Cir.2010)................................................................18

*Dickerson v. United States*,
    530 U.S. 428 (2000)................................................................11

*East v. Scott,*
    55 F.3d 996 (5th Cir. 1995) ................................................................31

*Fuertado v. City of New York,*
    337 F.Supp.2d 593 (S.D.N.Y.2004)................................................................26

*Fulton v. Robinson,*
    289 F.3d 188 (2d Cir.2002)................................................................17

*Gallo v. Prudential Residential Services, Ltd. Partnership,*
    22 F.3d 1219 (2d Cir. 1994)................................................................3, 4

*Green v. Scully,*
    850 F.2d 894 (2d Cir.1988)................................................................5, 11

*Harlow v. Fitzgerald,*
    457 U.S. 800, 102 S.Ct. 2727 (1982)................................................................14

*Harris v. City of New York,*
    186 F.3d 243 (2d Cir.1999)................................................................32

*Heck v. Humphrey,*
    512 U,S, 477 (1994)................................................................26

*Hill v. Melvin,*
    No. 05 Civ. 6645, 2006 WL 1749520 (S.D.N.Y. June 27, 2006)................................................................26

*Holbrook v. Flynn,*
    475 U.S. 560 (1986)................................................................20

*Husbands ex rel. Forde v. City of New York,*
    335 Fed. Appx. 124 (2d Cir. June 30, 2009)................................................................18

*Jenkins v. City of New York,*
    478 F.3d 76 (2d Cir. 2007)................................................................27

iii

*Jocks v. Tavernier,*
    316 F.3d 128 (2d Cir 2003)............................................................................14

*Kent v. Thomas,*
    No. 10–3688–cv, 2012 WL 689127 (2d Cir. Mar.5, 2012) ......................18

*Kirby v. Illinois,*
    406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)..............................14

*Lawrence v. City Cadillac,*
    No. 10 Civ. 3324, 2010 WL 5174209 (S.D.N.Y. Dec.9, 2010)................19

*Lowth v. Town of Cheektowaga,*
    82 F.3d 563 (2d Cir.1996).....................................................................18, 19

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir.2008)........................................................................28

*Malley v. Briggs,*
    475 U.S. 335, 106 S.Ct. 1092 (1986).........................................................15

*Manganiello v. City of New York,*
    612 F.3d 149 .............................................................................................17

*Martinez v. City of Schenectady,*
    97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560 (2001).......................17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio, Corp.,*
    475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ..............................3

*McClellan v. Smith,*
    439 F.3d 137 (2d Cir.2006)........................................................................20

*McIntosh v. Conway,*
    2014 WL 502735 (S.D.N.Y 2014)..............................................................30

*Miranda v. Arizona,*
    384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ...............................14

*Morse v. Spitzer,*
    2012 WL 3202963 (E.D.N.Y. 2012).....................................................19, 20

*Mullenix v. Luna,*
    136 S. Ct. 305 (2015)..............................................................................15, 27

*Myers v. Cty. of Nassau*,
   825 F. Supp. 2d 359 (E.D.N.Y. 2011) ...................................................................14

*Neighbour v. Covert*,
   68 F.3d 1508, (2d Cir.1995)...................................................................................14

*Nesbitt v. County of Nassau*,
   2006 WL 3511377 n. 7 (E.D.N.Y.2006).................................................................13

*Niemann v. Whalen*,
   911 F. Supp. 656 (S.D.N.Y. 1996) ........................................................................24

*Owens v. Okure*,
   488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)...........................................32

*Paige v. City of New York*,
   2011 WL 3701923 (E.D.N.Y.2011).........................................................................14

*Pearson v. Callahan*,
   555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).............................................14

*People v. Tankleff*,
   199 A.D.2d ...............................................................................................................12

*People v. Washington*,
   86 N.Y.2d 189 (1995) ...............................................................................................31

*Pinaud v. County of Suffolk*,
   52 F.3d 1139 (2d Cir.1995).......................................................................................32

*Poux v. Cty. of Suffolk*,
   2012 WL 1020302 (E.D.N.Y. Mar. 23, 2012) ..................................................18, 29

*Rae v. County of Suffolk*,
   693 F.Supp.2d 217 (E.D.N.Y.2010) ........................................................................18

*Reichle v. Howards*,
   566 U.S. ——, 132 S.Ct. 2088, (2012)....................................................................15

*Ricciuti v. New York City Transit Auth.*,
   124 F.3d 123 (2d Cir.1997).......................................................................................20

*Rothstein v. Carriere*,
   373 F. 3d 275 (2d Cir. 2004).....................................................................................18

*Rounseville v. Zahl,*
   13 F.3d 625 (2d Cir.1994)..................................................................17

*Russo v. City of Bridgeport,*
   479 F.3d 196 (2d Cir.2007)..........................................................15, 27

*Saucier v. Katz,*
   533 U.S. 194, 121 S.Ct. 2151, (2001)...............................................15

*Savino v. City of New York,*
   331 F.3d 63 (2d Cir.2003)...........................................................17, 18

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973)...........................................................................11

*Singer v. Fulton Cnty. Sheriff,*
   63 F .3d 110 (2d Cir. 1995)...............................................................19

Smith v. Edwards,
   2000 WL 709005*6 (S.D.N.Y. 2000).................................................31

*Smith-Hunter v. Harvey,*
   95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)..............18

*Tankleff v. Senkowski,*
   993 F.Supp 151 (EDNY 1997) ..........................................................11

*Tapia-Ortiz v. Doe,*
   171 F.3d 150 (2d Cir.1999)................................................................32

*Tomasino v. Estee Lauder Companies, Inc.,*
   2015 WL 4715017 (E.D.N.Y.  2015)...................................................21

*U.S. v. Middlemiss,*
   217 F.3d 112 (2d Cir. 2000)...............................................................31

*U.S. v. Parks,*
   100 F.3d 1300 (7th Cir. 1996) ............................................................31

*U.S. v. Zagari,*
   111 F.3d 307 (2d Cir. 1997)................................................................30

*United States v. LeRoy,*
   687 F.2d 610 (2d Cir. 1982)................................................................30

vi

*United States v. Orlandez–Gamboa,*
   320 F.3d 328 (2d Cir.2003)...................................................................4, 10

*United States v. Paulino,*
   445 F.3d 211 (2d Cir. 2006)........................................................................30

*United States v. Quintieri,*
   306 F.3d 1217 (2d Cir.2002).......................................................................21

*United States v. Ruiz,*
   536 U.S. 622 (2002)...................................................................................20

*Ying Jing Gan v. City of New York,*
   996 F.2d 522 (2d Cir. 1993)..........................................................................4

*Zahrey v. Coffey,*
   221 F.3d 342 (2d Cir.2000).........................................................................20

Statutes
42 U.S.C. § 1983............................................................................................1
N.Y. Pen. Law 30.00 (1)...............................................................................11

Rules

Fed. R. Civ. P. 12 (c) ........................................................................1, 13, 20
*Fed. R. Civ. P. 56 (c)* ...................................................................................3
Fed.R.Civ P. Rule 56 ....................................................................................33
Fed.R.Civ.P. 56(c)(1)(A) .............................................................................26
Fed.R.Civ.P. 56(c)(1)(B) .............................................................................26

## PRELIMINARY STATEMENT

Retired Detective K. James McCready, Retired Detective Norman Rein, Retired Detective Charles Kosciuk, Retired Detective Robert Doyle, Retired Detective Lieutenant John McElhone, and the County of Suffolk, defendants in this civil rights action pursuant to 42 U.S.C. § 1983, submit this memorandum of law in support of their motion for partial summary judgment dismissing the amended complaint ("the complaint") filed by the plaintiff.[1]

On March 24, 2009, plaintiff filed his original Summons and Complaint in the United States Courthouse for the Eastern District of New York. The defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12 (c) and on December 21, 2010 this honorable Court granted the motion in part and denied it in part. The Court dismissed claims in the complaint based on conspiracy, supervisory liability under § 1983, false imprisonment, suppression of exculpatory evidence/Brady, failure to investigate, and intentional or negligent infliction of emotional distress. The Court permitted the claims of malicious prosecution (§ 1983 and pendant State action); fabrication of evidence; coercion and violation of right to counsel; and the Monell claim against the County to proceed. The Court's decision effectively dismissed all claims against defendants Kosciuk and McElhone, as well as all federal claims against defendant Doyle, with only a state claim of Malicious Prosecution remaining against Doyle.

In May of 2015, Magistrate Judge Anne Y. Shields granted the plaintiff's motion to amend the complaint to add a new claim alleging a Brady violation relating to an alleged withholding of exculpatory evidence concerning the opinion of the medical examiner, Dr. Vernard Adams. The amended complaint states in an unsupported conclusory fashion that "Defendants Doyle, Rein, McCready, and Kosciuk hid this exculpatory evidence."

---

[1]  The defendants acknowledge that a genuine issue of fact exists regarding the nature in which the plaintiff's inculpatory statements were taken. Having reviewed the applicable law, we will not be moving for summary judgment on the plaintiff's fabrication of evidence claim. Further, as a claim will remain alleging an underlying constitutional violation, regardless of the outcome of the instant motion, the defendants will not be moving for summary judgment on the plaintiff's Monell claim against the County.

The defendants now move for summary judgement as to plaintiff's claims for malicious prosecution, coercion and violation of right to counsel, and the newly added <u>Brady</u> violation. The defendants respectfully submit that, based upon the available undisputed facts in the record, the statement given by the plaintiff was as a matter of law voluntary and not the result of coercion.  Further, the malicious prosecution claims must be dismissed as there was probable cause to arrest and prosecute the plaintiff independent of any allegedly coerced statements, and that the circumstances surrounding plaintiff's admission of "Yeah I did it" are not in dispute, and as such this statement can be  included in the probable cause analysis as well.   Additionally, the criminal charges against the plaintiff were not result in a favorable termination.   Moreover, the defendants are entitled to qualified immunity on the above claims as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Plaintiff's newly added <u>Brady</u> claim must also be dismissed as the assertion that  the medical examiner, Dr. Vernard Adams expressed to the detectives that "there was no reasonable possibility that the watermelon knife was the murder weapon" is simply not supported in the record.   Additionally, the evidence was not suppressed within the meaning of the <u>Brady</u> doctrine because the plaintiff's criminal attorney either knew, or should have known, of the essential facts permitting him to take advantage of that exculpatory evidence.   Lastly, the Brady claim is barred by the statute of limitations.

 As defendants now explain in the accompanying memorandum of law, the plaintiff cannot recover upon the above claims.

<u>STATEMENT OF RELEVANT FACTS</u>

The relevant facts are set forth in the Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 and the exhibits therein and attached thereto and are adopted as if more fully set forth herein.   Specific facts, which the defendants assert are not in dispute or which have

not been sufficiently disputed or controverted by the plaintiff, and which are salient to the arguments advanced by the defendants are included within the individual Points dedicated to those arguments.

<u>STANDARD OF REVIEW</u>

It is well settled that summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". *Fed. R. Civ. P. 56 (c)*; *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed 2d 28 265 (1986).

The trial court's task at the summary judgment stage of the litigation is limited to discerning whether there are genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding. It does not extend to issue resolution. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552. Once the moving party had met this burden, the non-moving party must come forward with "specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio, Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant must surpass a definite evidentiary threshold:

> …the non-moving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary

3

> judgment is appropriate where the moving party can show that
> "little or no evidence may be found in support" of the non-moving
> party's case. *Gallo v. Prudential Residential Services*, 22 F.3d
> 1219, 1223-24 (2d Cir. 1994).

*Corbett v. Firstline Security Inc.,* 687 F.Supp.2d 124 (E.D.N.Y., 2009).

Stated alternatively, to survive a motion for summary judgment, the non-movant must do more than present evidence that is merely colorable, conclusory or speculative. *Anderson*, 477 U.S. at 249-50. The non-movant must offer evidence that demonstrates the existence of a genuine issue of material fact that must be decided by a jury. *Id.* The non-moving party must produce evidence in the record "and may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

## POINT I

### PLAINTIFF'S CONFESSION WAS VOLUNTARY AND NOT COERCED AS A MATTER OF LAW

The plaintiff claims that his confession to defendants McCready and Rein was involuntary and the result of coercion and thereby violated 5th Amendment rights. He also claims a violation of his 6th Amendment rights to counsel. The defendants respectfully submit, that as a matter of law, based upon the available evidence in the record, plaintiff's statement was not coerced.

Defendants are aware that no single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *United States v. Orlandez–Gamboa,* 320 F.3d 328, 332 (2d Cir.2003). When conducting this analysis, factors to be considered are: (1) the characteristics of the accused, including the accused's experience, background, youth, and lack of education or intelligence; (2) the conditions of interrogation, including the place where the interrogation was held, the length of the detention, and the presence or absence of counsel; and (3) the conduct of law enforcement officials, including the repeated and prolonged nature of the

questioning, failure to inform the accused of his constitutional rights, physical deprivations of food, water, or sleep, and psychologically coercive techniques such as brainwashing or promises of leniency or other benefits. *Green v. Scully,* 850 F.2d 894, 901–02 (2d Cir.1988).

The defendants submit that undisputed facts in the record reveal the following:

On the day of the murders, at about 8:40 a.m. the plaintiff accompanied Detective McCready to Police Headquarters to talk to him further about what he had been telling the detectives and about Jerry Steuerman.    While the plaintiff claims that he was not asked to go, but only went after Detective McCready refused repeated requests to allow the plaintiff visit his father at the hospital, on direct examination at his trial the plaintiff testified that:

"Detective McCready asked if I would mind going down to Police Headquaters and speak with him about Jerry Steuerman and my father's business interests" (Exhibit TT – Tankleff at 4138:21).    Tankleff replied "I'd like to go to the hospital first" and McCready responded "Well, I'll take you there later." (Exhibit TT – Tankleff at 4138:25 -4139:2).

 The plaintiff does not contend, nor does he have any evidence that he was subjected to any kind of physical or verbal threats by Detective McCready on the way to the Headquarters. McCready arrived at police headquarters with plaintiff at approximately 9:20 a.m.    Detective McCready asked  the plaintiff if he wanted a cup of coffee, and when the plaintiff indicated that he did, he gave him a cup of coffee.    Plaintiff sat in an interview room for approximately twenty minutes as McCready waited for Detective Rein to arrive at headquarters.

At approximately 9:40 a.m., Rein and McCready entered the interview room and made "small talk" with plaintiff.  At approximately 9:45 a.m., plaintiff removed three tissues from one of his pockets and placed them on a desk.    For approximately the next two hours, the detectives engaged the plaintiff in conversation regarding topics ranging from Seymour Tankleff's business relationship with Jerry Steuerman and his father's other business and investment interests,  to the type of car the plaintiff drove and his interest in cooking.   When speaking about Steuerman he

said that Jerry and his father were having an ongoing dispute about his father buying into one of Jerry Steuerman's bagel stores. He told Rein and McCready that his father and Steuerman pretended to be good buddies but they did not like each other anymore. He also told Rein and McCready that he knew a lot about his father's business dealings and that his father was grooming him for the business world. Plaintiff told Rein and McCready that he wasn't going to receive anything under his parents will until he was 25 and that he was going to get more than his sister.

He described his relationship with his family, that he was adopted and loved his nieces and nephews, and about how his mother and father met. He also told the detectives that he had a loving relationship with his mother and father, that he had an aversion to blood, and that he could talk to his father about anything.

Plaintiff also told Rein and McCready about what he did on the evening of September 6, and that he took a shower that night before going to bed. He told detective Rein and McCready that his mother slept in the bed closest to the sliding glass doors, and that he gave his mother a kiss good night the night before. Plaintiff discussed girls, and said he had surgery two weeks prior, and now had to wear glasses because of surgery.

The questions and answers during this period of time were conversational and the plaintiff answered the question in a completely narrative fashion. It is significant that, while not admitting to the sequence that these topics were discussed, the plaintiff admits that they were discussed and does not deny providing the information to the detectives.

After having discussed the various above described topics, detective Rein and McCready asked the plaintiff to demonstrate how he had administered first aid to Seymour. Plaintiff voluntarily did so and demonstrated on Rein. Up until this demonstration, plaintiff answered the questions that were posed to him in the interrogation room. Additionally, up until this point, the plaintiff was not threatened with any physical harm if he refused to answer the questions.

During the questioning of the plaintiff he voluntarily made three sketches for Rein and McCready showing how the cars belonging to the card players were parked in the driveway; the general layout of the house showing the office/gym, bedrooms, closets and bathrooms; where Arlene was in the bedroom when he looked in; and where he was standing when he looked in, which was signified by a line drawn in the bedroom foyer.

The plaintiff admits to making the drawings, but does not recall when he made the drawings and claims that he made some of the drawings when the interrogation was over and some during.    It is significant, however, that the plaintiff voluntarily agreed to make the drawings.

While the plaintiff was demonstrating how he administered first aid to his father, the movement of plaintiff's sweatshirt allowed McCready to see plaintiff's right shoulder.  McCready observed blood on the shoulder.  At this time, McCready asked plaintiff when he had  last showered and plaintiff replied "last night."  The plaintiff demonstrated how he administered first aid to his father with Detective Rein portraying his father by sitting in a chair, and in doing so  he made physical contact with Detective Rein.    The plaintiff also told Rein and McCready that he never touched his mother that morning, and that he was not wearing a sweatshirt when he got up that morning.

A  photograph of the plaintiff taken at police headquarters on September 7, 1988 does not show any blood on the plaintiff's shorts and plaintiff acknowledged this during his testimony at the criminal trial.   Further, Rein, who had been an Emergency Medical Technician for 31 years, noted plaintiff was calm and not at all indicating any symptoms of shock at the violent death of his mother and attack on his father.    The plaintiff does not deny that Detective Rein so testified, but claims he was in shock.    However, the plaintiff has produced no evidence that he exhibited any outward signs of being in shock.

7

At about 11:15 a.m. some 95 minutes into the questioning, and after having observed blood on plaintiff's shoulder, Rein and McCready became accusatory.   The plaintiff admits that the detectives testified that they became accusatory around 11:15 and after Tankleff demonstrated how he had helped his father, but deny this would have been only 95 minutes into the questioning. However, plaintiff has no provided any admissible evidence to rebut the sworn testimony of the detectives regarding this issue.

What is not in dispute is that up until the demonstration made by the plaintiff, which aroused the detectives suspicions because of the blood observed on the plaintiff, none of the questioning had been accusatory, and all of the plaintiff's responses were voluntary, detailed and given in a narrative form.

Between approximately 11:15 am and 11:54 am the detectives confronted the plaintiff with inconsistencies between what he was telling them and what they had learned at the crime scene. Although the plaintiff denies there were inconsistencies between what the plaintiff was telling them and what they had learned at the crime scene,   it is not disputed that the detectives confronted the plaintiff with what they perceived as inconsistencies, and that the confrontational questioning started after the plaintiff demonstrated how he rendered aid to his father.   Again, the plaintiff has submitted no evidence to rebut the testimony of the detectives' testimony that they began to confront the plaintiff at approximately 11:15.

Between approximately 11:15 am and 11:54 McCready and Rein raised their voices and the plaintiff says that McCready screamed and cursed at him and jammed his finger into the plaintiff's chest.   Beyond this conduct, the plaintiff does not claim that the detectives subjected him to any threats of physical violence.

At approximately 11:54 detective McCready entered the room and employing a ruse, he told plaintiff that Seymour had regained consciousness and said that plaintiff had "beat and stabbed" him.   Plaintiff stated that if his father said that, he did so because the plaintiff had helped

him that morning.   Plaintiff said he would take a lie detector test.   Plaintiff told the detectives that whoever did this "needs psychiatric help" and then asked "could I have blacked out and done it?"  "Maybe it wasn't him but another Marty Tankleff that killed them."   The plaintiff does not recall if he made these statements and accordingly, has failed to sufficiently rebut the sworn testimony of both detectives.

The rhetorical statement "could I have blacked out"  was made by the plaintiff to the detectives and was not suggest to him by the detectives.   Plaintiff claims the detectives had him believing that he committed the murders.

Detective McCready asked the plaintiff "did you kill your mother and did you hurt your father?" and the plaintiff responded "Yeah I did it."   This plain and clear admission was made by the plaintiff to the detectives as the result of non-accusatory question.   Further, it was made in the wake of the plaintiff having been told that his father had regained consciousness, thereby enhancing its reliability.

After telling the detectives that he killed his mother and hurt his father plaintiff told the detectives that he wanted to go to Florida and he was planning on going to the Wharton School of Business.   The plaintiff then confessed to the detectives how he killed his mother and hurt his father.   A genuine issue of fact exists regarding the nature in which the plaintiff's inculpatory statements were taken.   The defendants submit that the plaintiff confessed in a narrative fashion; the plaintiff claims that he acquiesced to leading suggestions made by the detectives.    The plaintiff does not, however, deny that he in fact admitted to killing his parents, and at least agreeing to suggestions how that was done.   And most significantly, the plaintiff asserts, that during back and forth process of "acquiescing", when the detectives would ask him a question, he would say "I don't know what you are talking about; I didn't do anything.  And they would once again re-ask the question or make a statement to me, and I would say, well, you know, I don't

remember doing anything.  I didn't do anything.  If you're saying I did something, then I would just acquiesce to what they were saying."  (Exhibit AAA – Tankleff deposition at 124:3-5).

Whether the admission was given in a narrative fashion or through a process of acquiescing, after the statement was taken, the plaintiff signed a consent form to take forensic evidence from him.   At 1:22 p.m,  family attorney Myron Fox called police headquarters and directed the detectives to stop their questioning of plaintiff.   And at that time all questioning of the plaintiff ended.

Although the plaintiff claims he was choked by Detective McCready on the day of his arrest, he claims this did not occur until later in the day after he made his confession.

Plaintiff's false confession expert, Mr. James Trainum, who has examined the circumstances surrounding the plaintiff's interrogation is not aware of any threats of harm made to the plaintiff by the detectives prior to the plaintiff confessing to the crime, nor is he aware of any evidence that the detectives impliedly or actually threatened the plaintiff with any inevitable consequences to get him to admit to the crimes.

The defendants respectfully submit, that as a matter of law, based upon the undisputed, or insufficiently rebutted evidence above, the plaintiff's statement was not coerced and was given voluntarily.   As noted above, no single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." _United States v. Orlandez–Gamboa,_ 320 F.3d 328, 332 (2d Cir.2003).  When conducting this analysis, factors to be considered are: (1) the characteristics of the accused, including the accused's experience, background, youth, and lack of education or intelligence; (2) the conditions of interrogation, including the place where the interrogation was held, the length of the detention, and the presence or absence of counsel; and (3) the conduct of law enforcement officials, including the repeated and prolonged nature of the questioning, failure to inform the accused of his constitutional rights, physical deprivations of

food, water, or sleep, and psychologically coercive techniques such as brainwashing or promises of leniency or other benefits. _Green v. Scully,_ 850 F.2d 894, 901–02 (2d Cir.1988).    The essential question to be asked is "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession. _Dickerson v. United States_, 530 U.S. 428, 434 (2000); _citing Schneckloth v. Bustamonte,_ 412 U.S. 218, 223 (1973).

The defendants' submit that a careful evaluation of the evidence and the totality of the surrounding circumstances reveals that the plaintiff's statement was not the result of unconstitutional coercion.    The plaintiff at the time was considered an adult under the New York Penal Law (N.Y. Pen. Law 30.00 (1)), and was "a sophisticated and above average high school student who was considering entering college at the time of the murders". _Tankleff v. Senkowski,_ 993 F.Supp 151 (EDNY 1997).    The plaintiff accompanied detective McCready to Police Headquarters after being asked, and despite his claimed request to go to the hospital, was told he would be taken there later.    He was never denied the opportunity to go the hospital or was told he could not go.    The plaintiff alleges no coercive conduct during the ride to the precinct or while waiting the twenty minutes for Detective Rein to arrive.    It is undisputed that for next 90 minutes to two hours, the plaintiff voluntarily engaged in conversation with the detectives wherein he answered questions on a host of topics, and did so all in a narrative fashion. While some of the questions related to the investigation of the murders, such as the business relationship between Seymour Tankleff and Jerry Steuerman, and questions relating to the plaintiff's actions the night before the murder, and other questions concerned the plaintiff's background, family relationships and hobbies, none of the questions were accusatory in nature or suggested that the plaintiff was involved in the murder of his parents.    This can hardly be viewed as an interrogation that was repetitive, prolonged or relentless.

Further, the accusatory nature of the questioning and accompanying vocal changes by the detectives did not begin until after the plaintiff had voluntarily demonstrated how he helped his

father in a fashion that was perceived by the detectives to be inconsistent with the physical evidence they had observed at the scene and on the plaintiff.    And after only 39 minutes of this kind of questioning the plaintiff confessed to the detectives by stating clearly and plainly in response to the simplest inquiry of whether he killed his mother and hurt his father, "Yeah, I did it."

That the plaintiff's clear and unequivocal admission came in the wake of being told that his father was alive and had implicated him the crime, only served to enhance the reliability of such and admission, and negated any suggestion that such a response was the result of having one's will overborne.

Further, as noted by the New York State Appellate Division in denying plaintiff's first post-trial appeal, the methods used by Detective McCready were neither unlawful nor unreasonable.    Indeed the Court noted:

> it is clear to us that the type of trickery employed by Detective McCready in this case was not likely to provoke an unreliable confession; on the contrary, we find that the factual reliability of the defendant's confession was, if anything, enhanced by the nature of the particular ploy which was used to elicit it.  Needless to say, we give no credence to the defendant's claim that he confessed because he was "brainwashed."

*People v. Tankleff*, 199 A.D.2d at 553, *aff'd.* 84 N.Y.2d 922 (1994).

Additionally, throughout the questioning, the plaintiff voluntarily demonstrated how he claimed that he helped his father, drew several diagrams of the house, the location of the card players cars in the driveway, and the location of his mother in the bedroom, and the point up to where he entered.   While the plaintiff alleges that the questioning that resulted in his confession was leading and suggestive and that he only acquiesced to suggestions, he does not allege that the detectives used any kind of physical force or threats of force, or promises to get him to acquiesce. Perhaps the most significant evidence that the plaintiff's will was not overborn, is his own testimony that when a suggestion would be made to him, he would say "I don't know what you

are talking about; I didn't do anything."   And then when asked again a statement was made to him he would say "well, you know, I don't remember doing anything.  I didn't do anything.  If you're saying I did something, then I would just acquiesce to what they were saying."     The very fact that the plaintiff was consciously aware that he did not do anything, and told the detectives that he did not do anything; coupled with the fact that  he told the detectives that he didn't know what they were talking about; but then  made the conscious choice to  just go along with what they were saying, is the ultimate expression of exercising one's own free will.   It cannot be said that the plaintiff's will was overborn when his own testimony reveals that he knew what he was doing, and what he was saying, and voluntarily chose to go along with their suggestions.

Why he chose to tell the detectives that he committed the crime, is not the issue, so long as the reason he chose to tell them was not the result of coercion.

Additionally, as noted in the defendants motion to dismiss pursuant to Fed.R. Civ.P 12(c), the legality of the ruse or stratagem employed by the detectives, as well as the voluntariness and admissibility of Tankleff's confession, have been litigated no less than four times, each time resulting in a finding against Tankleff.   While these decisions did not have a preclusive effect on the instant claim due to the vacature of  the plaintiff's conviction, the reasoning and analysis of these Courts is beyond challenge.   Based upon the above, the defendants respectfully submit that the statement and admission of  the plaintiff that he killed his parents, was not involuntary and was not in violation of his constitutional rights.

### _Miranda violation_

Plaintiff claims that in addition to his statement being the result of unconstitutional coercion, that he was not read his Miranda warnings prior to giving the statement.   The Fifth Amendment protects against the admissibility of incriminating statements obtained during custodial interrogation of a person who has not properly waived his right to counsel. _Nesbitt v._

13

*County of Nassau,* 2006 WL 3511377 *2 n. 7 (E.D.N.Y.2006); *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  However, the remedy for a violation of this right is exclusion of any self-incriminating statements from use at a criminal proceeding, and not an action for damages under Section 1983. *Myers v. Cty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011). *Jocks v. Tavernier,* 316 F.3d 128 (2d Cir 2003); *Neighbour v. Covert,* 68 F.3d 1508, (2d Cir.1995); *Paige v. City of New York,* 2011 WL 3701923 *3 (E.D.N.Y.2011). Accordingly, to the extent that the plaintiff claim's that he was not read Miranda warnings prior to his interrogation, such a claim must be dismissed.

### *Right to Counsel*

The plaintiff also claims that he was denied the right to counsel during the interview and interrogation process at Police Headquarters.  However, "[i]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972).  Since, the plaintiff had not yet been arrested or charged with any crime at the time of questioning, hisr Sixth Amendment rights had yet to attach. Accordingly, any claim for a denial of right to counsel must be dismissed as well.  *Neighbour v. Covert,* 68 F.3d 1508 (2d Cir. 1995)

### *Qualified Immunity*

Even if the Court were to conclude that a genuine issue of fact exists that would preclude a finding that the plaintiff's admission was coerced, the claim against the detectives must be dismissed as they are entitled to qualified immunity.   The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. P*earson v. Callahan,*  555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,*  457 U.S. 800, 818, 102 S.Ct. 2727 (1982).   The doctrine's purpose has been

14

described as "balanc[ing] two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson* at 129.

The principle protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. R*usso v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir.2007).

The Supreme Court has recently instructed that "a clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna,* 136 S. Ct. 305, 308-09 (2015); *citing,*

*Reichle v. Howards*, 566 U.S. ——, 132 S.Ct. 2088, (2012) "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 (1986).

In *Mullinex*, the Court went on to state: "We have repeatedly told courts ... not to define clearly established law at a high level of generality." *Mullinex* 308-309, *citing al–Kidd, supra,* at 742, 131 S.Ct. 2074.  The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, (2004) (*per curiam*)(quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, (2001).

In examining the conduct of the detectives McCready and Rein and the alleged  allegedly coercive circumstances of the confession, it is not enough to determine that it may have been clearly established in 1989 that criminal suspects had a due process right to be free from official

conduct designed to overcome the accused's will and produce an involuntary incriminating statement.  The Supreme Court instructs that the inquiry must go further and examine whether the violative nature of *particular* conduct is clearly established and whether existing precedent has placed the statutory or constitutional question beyond debate

The defendants submit, that in regard to the particular conduct of detectives McCready and Rein, even when viewed in a light most favorable to the plaintiff, it cannot be said  that at the time of the claim it was clearly established that such conduct would be violative of a plaintiff's constitutional rights.   As noted above, four Courts examined the conduct of the detectives and determined that it was not coercive.   Further, the trial jury in the plaintiff's criminal case was instructed they must find that the plaintiff's confession was voluntary before they could consider it, and having been so instructed determined that the confession could be considered.   Lastly, in 2008, the New York State Commission of Investigation (SIC) issued a report finding that the procedures used by the detectives in questioning plaintiff were "proper in all respects," and were within the "confines of the law" and that the confession was not obtained "by way of force or coercion;"   While the plaintiff disagrees with these findings, the fact remains that several courts and the New York State SIC has found the conduct of the detectives to be lawful.   Against this backdrop, it cannot be said that the law in 1989 was clearly established and beyond debate that the methods used and stratagem employed by the detectives was violative of the constitutional rights of the plaintiff.

Additionally, it was not objectively unreasonable for the defendants to believe  that the plaintiff's admissions of guilt were genuine and not coerced, especially when the plaintiff himself asserted  that he "believed" he had committed the crime when he made those admissions, and the plaintiff's own expert admits that he is not aware of any threats of harm made to the plaintiff by the detectives prior to the plaintiff confessing to the crime, nor is he aware of any evidence that the detectives impliedly or actually threatened the plaintiff with any inevitable consequences to

get him to admit to the crimes.    Accordingly, the detectives are entitled to qualified immunity on the claim that the statement given by the plaintiff was the result of coercion, and the claim must be dismissed.

## POINT II

### PLAINTIFF'S MALICIOUS PROSECUTION CLAIMS MUST BE DISMISSED AS THERE WAS PROBABLE CAUSE TO ARREST AND INITIATE THE PROSECUTION AGAINST HIM INDEPENDENT OF ANY ALLEGED FABRICATED EVIDENCE

The plaintiff has brought § 1983 claims of malicious prosecution against defendants McCready and Rein, and a pendent State malicious prosecution claim against McCready, Rein and defendant Doyle.    The defendants respectfully submit that the claims must be dismissed as the plaintiff cannot establish several of the essential elements to bring such a claim, chief among them the lack of probable cause to initiate the prosecution.

In order to prevail on a Section 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment,, and must establish the elements of a malicious prosecution claim under state law. *Manganiello v. City of New York,* 612 F.3d 149. 160–61 (2d Cir.2010): *see also Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (accord). To establish a claim of malicious prosecution under New York law, a plaintiff must demonstrate: (1) that the defendant commenced or continued a criminal proceeding against him or her (2) without probable cause and (3) out of malice; and (4) that the criminal proceeding terminated in his or her favor. *See Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003); *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003); *Martinez v. City of Schenectady,* 97 N.Y.2d 78, 84, 735 N.Y.S.2d 868, 761 N.E.2d 560 (2001).

In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of."*Rounseville v.*

17

*Zahl,* 13 F.3d 625, 629–30 (2d Cir.1994); *Poux v. Cty. of Suffolk*, 2012 WL 1020302, at *1-36 (E.D.N.Y. Mar. 23, 2012); *see also Colon v. New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983) (holding that probable cause to prosecute consists of 'such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.") "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."*Savino,* 331 F.3d at 72;*see also Dickerson v. Napolitano,* 604 F.3d 732, 751 (2d Cir.2010) (accord).   Furthermore, "[b]ecause "accusers must be allowed room for benign misjudgments," the New York Court of Appeals has held that the law "places a heavy burden on malicious prosecution plaintiffs....". *Rothstein v. Carriere*, 373 F. 3d 275, 282 (2d Cir. 2004) *quoting*, *Smith-Hunter v. Harvey,* 95 N.Y.2d 191, 195, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000).

Defendants are cognizant that even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause."*Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996) (quotations and citations omitted); *see also Kent v. Thomas,* No. 10–3688–cv, 2012 WL 689127, at * 1 (2d Cir. Mar.5, 2012) (summary order). However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact."*Lowth,* 82 F.3d at 571;*see also Husbands ex rel. Forde v. City of New York,* 335 Fed. Appx. 124, 128 (2d Cir. June 30, 2009) (summary order); *Carrow v. City of New York,* No. 06 Civ. 1436, 2010 WL 1009996, at * 8 (S.D.N.Y. Mar. 17, 2010)."[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. County of Suffolk,* 693 F.Supp.2d 217, 227 (E.D.N.Y.2010), "[D]efendants are not obliged to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would have done so

may be evidence of lack of probable cause."*Lawrence v. City Cadillac,* No. 10 Civ. 3324, 2010 WL 5174209, at * 6 (S.D.N.Y. Dec.9, 2010) (quoting *Lowth,* 82 F.3d at 571).

### *Lack of Probable Cause*

The defendants respectfully submit, that based upon the available undisputed facts in the record, the plaintiff cannot establish the essential element of his malicious prosecution claim of lack of probable cause.   Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."*Chandok v. Klessig,* 632 F.3d 803, 812 (2d Cir.2011); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof).

The defendants recognize that the plaintiff alleges that chief among the evidence considered by the detectives in deciding to prosecute the plaintiff were the admissions made by the plaintiff that he claims they later misrepresented as being given in a narrative fashion.   This conduct, however, constitutes and separate constitutional violation recognized as denial of a right to a fair trial due to the fabrication of evidence.

When a plaintiff claims that a government official deprived him of his liberty by maliciously initiating criminal proceedings against him without probable cause he invokes the protection of the Fourth Amendment.  *Morse v. Spitzer*, 2012 WL 3202963, at *2-6 (E.D.N.Y. 2012); *citing Albright v. Oliver,* 510 U.S. 266, at 274–75 (1994) (holding that the Fourth Amendment protects the right to be free from prosecution except on the basis of probable cause); *Singer v. Fulton Cnty. Sheriff,* 63 F .3d 110 at 116 (2d Cir. 1995) ("The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the

person .”). For this reason, “[t]he absence of probable cause is an essential element to a claim for malicious prosecution.” *McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006).

In contrast, a claim that a government official denied an accused his right to a fair trial finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments, which secure the fundamental right to a fair trial in a criminal prosecution. *See Holbrook v. Flynn,* 475 U.S. 560, 567 (1986) (recognizing that the Sixth and Fourteenth Amendments secure the constitutional right to a fair trial); *United States v. Ruiz,* 536 U.S. 622 (2002) (same).  When a government official manufactures false evidence against an accused, and the use of that fabricated evidence results in the deprivation of the accused's liberty, the government official infringes the accused's constitutional right to a fair trial in a manner that is redressable in a § 1983 action for damages. *Zahrey v. Coffey,* 221 F.3d 342, 348–49 (2d Cir.2000); *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123 (2d Cir.1997).

Accordingly, when a Fourth Amendment claim for malicious prosecution is alleged based, *inter alia*, on the fabrication of evidence, the ultimate result will be that the existence of probable cause independent of the allegedly falsified evidence is a defense to that claim but not to the fair trial claim.  *Morse v. Spitzer*,  2012 WL 3202963, at *2-6 (E.D.N.Y. 2012).

The defendants submit that a review of the facts independent of the alleged fabricated evidence reveal that there was probable cause to initiate and continue the prosecution against the plaintiff.    In fact, this Honorable Court has already reached that conclusion in it decision granting in part and denying in part the defendants motion pursuant to Fed. R. Civ P. 12 (c).

The defendants respectfully submit that probable cause existed to arrest and commence the criminal proceeding against the plaintiff, and that this Honorable Court has already made factual ruling supporting the existence of probable cause.    In dismissing the plaintiff's original State false imprisonment claim, this Court recognized and marshalled a series of facts offered at the plaintiff's trial, which independent of the alleged “coerced” confession, established the

20

existence of probable cause for his arrest. (Decision dated December 21, 2010 at pages 29-31, annexed as Exhibit KKK).  The Court also noted that the plaintiff did not deny these facts.      The defendants respectfully submit that the facts marshaled in this Court's opinion, which were used to establish the existence of probable cause sufficient to dismiss the plaintiff's State false arrest claim, are now established and cannot be controverted by the plaintiff.  *United States v. Quintieri,* 306 F.3d 1217, 1225 (2d Cir.2002); *see also  Tomasino v. Estee Lauder Companies, Inc*., 2015 WL 4715017, at *2 (E.D.N.Y.  2015).    The defendants further submit that several of these factual determinations involve the discovery of information after the plaintiff's arrest that served to bolster the initial probable cause assessment, much less limit or vitiate that initial determination.

The facts so marshalled by the Court are recounted below.   Even assuming that the facts can be revisited, the plaintiff's Rule 56 counter statement does not deny the existence of the facts, but rather puts forth alternative explanations of the facts that existed.    The facts marshalled are as follows:

  - although Tankleff told the Detectives at the scene that he had used the phone in his father's office to call 9-1-1, the blood spatter on the phone had not been disturbed;

*Plaintiff responds that later during his deposition upon examination with the use of a magnifying glass Detective McCready said that there could be some smearing.  This however, does not create a genuine issue of fact that the at the time of the observation of the phone on the morning of the murders the blood spatter appeared undisturbed.*

- although Tankleff told the Detectives at the scene that he rendered aid to his father, who had blood gushing out of his neck wound, no blood was observed on plaintiff's clothing;

*Plaintiff admits that Detective Rein testified to this fact, and that he does not have a recollection of exactly what he told the detectives.  Accordingly, it is insufficient to overcome the sworn testimony of Detective Rein.*

- although Tankleff stated to Detectives at the scene that, after rendering aid to his father, he then checked the garage, there was no blood on the door handle to the garage, or the dead bolt on the garage door, which was locked;

*Plaintiff responds that later during his deposition Detective McCready admitted that the door could have been opened without leaving blood.  However, it still remains that there was no blood*

21

*on the door handle and it was not unreasonable to include that observation in a probable cause analysis.*

- Tankleff stated to Detectives at the scene that he never entered his mother's bedroom, and observed from the door to the bedroom that her throat had been cut and that she was dead; however, Detectives at the scene could not observe Arlene's injuries until they entered the bedroom and stood directly over her;

*Again plaintiff does not have a recollection of exactly what he told the detectives, and despite his objection and denial that he "never" entered his mother's bedroom, the plaintiff's sworn trial testimony indicates that when he observed his mother he did so from the doorway and only went as far as the alarm wall.   He further testified that he wasn't wearing glasses or contact lenses.*

- Tankleff stated to Detectives at the scene that, after rendering aid to his father, his hands were covered with blood, yet the phones in the kitchen, one of which Tankleff used to speak to his sister and a friend on four occasions, had no blood on them;

*Plaintiff admits this fact but denies the implication that it is incriminating.   The Court has already determined that it is information which reasonably contributed to the probable cause determination.*

- Tankleff stated to Detectives at the scene that, after getting up, he first looked in his mother's bedroom, which was dark because the drapes were drawn, and he did not see anyone. Yet when the Detectives inspected the scene they observed that the drapes in the master bedroom were open;

*Plaintiff does not deny this fact but rather provides an explanation why he may have believed the drapes were drawn (that it was dark outside when he looked in).   However,  However, it still remains that the observation that the drapes were open was inconsistent with what the plaintiff told the detectives.*

- Tankleff did not appear upset or emotional [to investigators] at the scene[;]

*Plaintiff's points to evidence in the record that he was in shock, but produces no evidence that he appeared upset or emotional at the scene.*

- although his bedroom was directly across the hall from the master bedroom, Tankleff never claimed to have heard anything, although it appeared to Detectives at the scene that there had been a struggle in Arlene's bedroom.

*Plaintiff denies that his bedroom is directly across the hall, but does not deny the claim that he heard nothing.*

- Arlene had injuries on the back of her head and back, which could not be observed at the crime scene until after she had been rolled over, which occurred after the Detectives took Tankleff's confession, which injuries were consistent with Tankleff's confession;

*Plaintiff has produced no evidence that the injuries to the back of Arlene Tankleff's head were either known to the detectives prior to the plaintiff's confession, or were discovered before being rolled over.*

- after being arrested, Tankleff was heard telling his sister that he "acknowledged to the police that [he] did it;"

*Defendants acknowledge that plaintiff also claims he said "because they made me" but he still acknowledged to his sister that he told the police that he "did it".*

- examination of the crime scene revealed no sign of an intrusion;

*Plaintiff does not deny this fact, but pints out that the plaintiff claimed the front door was open when he woke up.*

- blood was observed on the door knob, light switch and wall near that switch in plaintiff's bedroom;

*Plaintiff does not deny this fact, but provides testimony from Detective McCready that it could have been consistent with someone groping for the light.   This however, does not exclude the observation of blood as a fact to be reasonably considered in evaluating probable cause.*

- the watermelon knife found in the kitchen was not in the position that the card player, who had used the knife, described having placed it on the evening of the card game;

*Plaintiff does not deny this fact.  Notwithstanding plaintiff's extensive forensic claims regarding the knife and his position that the knife was not used in the murders, the fact remains that the detectives were told by Vincent Bove that the position of the knife was different than when he had placed the knife down the night before.   The different positioning of the knife was certainly a fact that a reasonable police officer would consider in making a probable cause determination.*

- Arlene's autopsy results were consistent with Tankleff's confession as to how he killed his mother,

*Defendant's acknowledge that there are genuine issues of fact regarding this fact. However, plaintiff has produced no evidence that the specific circular like fractures to Arlene Tankleff's skull were not consistent with the bar bell alleged to be used in the crime.*

- those in attendance at the card game did not observe any problems at the game between any of the players including Steuerman and Seymour.

*Plaintiff does not deny this fact.*

The defendants respectfully submit that all of the above facts, as already recognized by this Court, served to establish that probable cause existed to initiate and continue a prosecution against the plaintiff independent of the claimed fabricated evidence.

Additionally, on the mornings of the murders the plaintiff had a conversation with Chief Constable Hines wherein Hines the plaintiff claimed that Jerry Steuerman murdered his parents. When Hines suggested to the plaintiff that his father was still alive and should he regain consciousness the police could verify if indeed Steuerman was the perpetrator, Hines said that the plaintiff picked up his head, his eyes widened and stopped taking.    Hines related this information to the detectives at the scene.    The plaintiff does not deny making these statements, but rather claims that he does not remember having a conversation with Constable Hines and cannot recall if he said the statements.  This is insufficient to overcome the sworn trial testimony of Constable Hines.    Accordingly, this is a fact that the court can consider in determining that there was information known to the detectives that provided probable cause to believe that the plaintiff had committed the crimes.

The defendants submit, that these facts, which have been adopted by the Court establish that there was probable cause to charge the plaintiff and maintain a prosecution against him. Accordingly, the plaintiff has failed to establish the necessary element of a malicious prosecution claim that there was a lack of probable cause, and as such the claims must be dismissed.

### *Consideration of Plaintiff's admission*

In addition, should the Court find that the admission made by the plaintiff to detectives of "Yeah, I did it", was lawfully obtained, it was proper for the defendants to reasonably believe that the plaintiff committed the murder of his parents, and coupled with the facts above, would give them greater evidence that probable cause existed.  *Niemann v. Whalen*, 911 F. Supp. 656, 668 (S.D.N.Y. 1996)  The plaintiff's cannot argue that this admission must be precluded from the probable cause on the basis that it was fabricated, as the plaintiff admits he made the statement, and did so as in the manner and fashion the defendants describe.

Keep  in mind, that the plaintiff's claim for fabrication is born out of the conduct of the detectives after the plaintiff's confession, and that they allegedly described the admissions as

24

coming in a narrative form after open ended questioning.   The plaintiff does not deny making some admissions to the detectives, but rather that the admissions were made by acquiescing to their suggestions.    This distinction is important in considering what information can be considered in the probable cause  analysis.   The defendants recognize that a detective could not rely upon falsified or fabricated evidence to reach a probable cause determination.  However, statements and admissions that the plaintiff admits he made to the detectives as they describe, so long as they were not coerced, can be included in that determination.    Accordingly, the pre and post confession facts known to the defendants as well as the clear and plain statement that "Yeah, I did it" establish the existence of probable cause to charge and maintain the prosecution against the plaintiff.

Lastly, the defendants submit that, if found to be lawful and not the result of coercion, the entirety of the plaintiff's confession, *as he claims it to have occurred,* could be used to determine the existence of probable cause.   Again, this is so because the alleged fabrication is the reporting by the detectives to the prosecutors that the plaintiff confessed in a narrative fashion.    This does not preclude them from considering the statements made by the plaintiff even if made as he claims through acquiescing to suggestions.   As noted above, the plaintiff's relief for the fabrication is a separate claim for a denial of a right to a fair trial.    His statements themselves, if lawful, cannot be excluded from the probable cause determination.

As there was probable cause to charge and maintain a prosecution against the plaintiff independent of the alleged coerced confession, the plaintiff's malicious prosecution claim must be dismissed.   Further, should the plaintiff's confession be determined to be lawful, that evidence establish an even greater finding of probable cause.

### *No favorable termination*

Defendants also submit that the criminal charges against the plaintiff did not terminate in a manor favorable to the plaintiff.   In this Court's decision on the defendants' motion to dismiss,

the Court engaged in thorough and well-reasoned analysis of the effect of *Heck v. Humphrey*, 512 U,S, 477 (1994), and *DiBlasio v. City of New York*, 102 F.3d 654 (2d Cir. 1996), and the necessary requirements to establish a favorable termination for the purpose of a malicious prosecution claim.    In concluding its analysis, the Court made the following ruling:

> This Court agrees with the Second Department; the newly discovered evidence supports Plaintiff's theories that someone else might be responsible for the murders of Seymour and Arlene Tankleff, but it does not necessarily establish actual innocence, see  *DiBlasio*, 102 F.3d at 657. Nevertheless, for purposes of surviving Defendants' motion to dismiss, Plaintiff has gone far enough. Accordingly, the Court DENIES Defendants' motion to dismiss this claim. The Court notes, however, that if after discovery the evidence does not more strongly establish Plaintiff's actual innocence, his § 1983 malicious prosecution claims may still be barred by Heck at the summary judgment stage of this case.  (Exhibit KKK at 16)

The defendants submit, that a review of the available evidence in the record does not reveal evidence, nor can the plaintiff produce any evidence beyond that alleged in the complaint which would more strongly establish his actual innocence.[2]    While the plaintiff has produced evidence that he claims undermines the theory of the prosecution's case against the plaintiff, and establishes that forensic testing failed to reveal evidence to corroborate some of the claims in the plaintiff's confession, all of this evidence serves merely as attacking the proof of plaintiff's guilt beyond a reasonable doubt.   It does not, however,  go further and more strongly establish his

---

[2] The defendants may point to the absence of evidence in the record to discharge its burden on an issue for which the plaintiff has the burden of proof, in this case the element of favorable termination. The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents ... [and] affidavits or declarations," Fed.R.Civ.P. 56(c)(1)(A), "which it believes demonstrate [s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may also meet its initial burden that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(B); *Hill v. Melvin*, No. 05 Civ. 6645, 2006 WL 1749520, at *4 (S.D.N.Y. June 27, 2006) ("The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof."); *Fuertado v. City of New York*, 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) ("The moving party may use a memorandum or brief to 'point to' the absence of evidence and thereby shift to the nonmovant the obligation to come forward with admissible evidence supporting its claim.").

actual innocence.    Accordingly, his malicious prosecution claim must be dismissed on this ground as well.

### *Qualified Immunity*

Even it is determined that there was not probable cause to initiate and maintain the prosecution against the plaintiff, there was "arguable probable cause" and the detectives were not objectively unreasonable in relying upon it.    Since their conduct was not objectively unreasonable they are entitled to qualified immunity from suit.

As noted above, qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. R*usso v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir.2007), *Betts v. Shearman,* 751 F.3d 78 (2d. Cir. 2014) *citing*, *Jenkins v. City of New York*, 478 F.3d 76, at 88 (2d Cir. 2007).    An officer's determination is objectively reasonable if 'officers of reasonable competence could disagree on whether the probable cause test was met." *Jenkins*, *supra* at 87.

While officers of reasonable competence could have disagreed on whether there was evidence to establish probable cause for the purpose of charging and maintaining a prosecution against the plaintiff,  it was not plainly incompetent or a knowing violation of the law for the detectives involved to believe the test was met, especially in light of the plaintiff's clear and plain admission that he killed his parents.    Accordingly the defendants would be entitled to qualified immunity.

Additionally, the law was not clearly established that under the specific facts of this case, including the facts and circumstances observed and known by the defendants, that charging and maintaining a prosecution against the plaintiff would rise to the level of violation of his constitutional rights, *Mullenix v. Luna*, 136 S. Ct. 305, 308-09 (2015), and the defendants are entitled to qualified immunity on this ground as well.

## POINT III

**PLAINTIFF'S CLAIM THAT DR. ADAMS TOLD DETECTIVES THERE WAS NO REASONABLE POSSIBILITY THAT THE WATERMELON KNIFE COULD HAVE BEEN USED IN THE CRIME IS UNSUPPORTED IN THE RECORD**

In the newly amended complaint the plaintiff advances a *Brady* claim premised upon the wholly conclusory assertion that Dr. Vernard Adams, the medical examiner that conducted the autopsies of Arlene and Seymour Tankleff, "in or around September 9, 1988, told the homicide detectives that there was no reasonable possibility that the watermelon knife was the murder weapon." He further claims that this information was then withheld from the prosecutors, including former Assistant District Attorney John B. Collins and Assistant District Attorney Edward Jablonski. Simply stated, there is no evidence in the available record to establish that Dr. Adam ever actually told any detective from the Suffolk County Police Department that he had reached this conclusion (if he ever did). The only evidence produced by the plaintiff is the vague, conclusory and entirely speculative statements of Dr. Adams that he "could have" mentioned his opinion to the detectives, and his flat out admission that he has no recollection of what he actually communicated to the detectives, if anything.

In general, a party opposing a properly supported motion for summary judgment is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion."), unless the pleadings are verified in a manner "equivalent of the oath that would be given with respect to an affidavit," *Fitzgerald,* 251 F.3d at 361, and assert factual matters other than upon "information and belief." *Id.* "In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008) (internal quotations and citations omitted). "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory * * * or based on speculation." *Id.*

28

at 310;*see also Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (holding that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment). *Poux v. Cty. of Suffolk,* 2012 WL 1020302 (E.D.N.Y. Mar. 23, 2012).

Of significance is that the plaintiff does not allege in the amended complaint that any particular named defendant detective a) either heard or acknowledged hearing the claimed statement from the medical examiner that there was "no reasonable possibility that the watermelon knife was the murder weapon" or b) that any named detective (had they heard such a statement) withheld this information. ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under§ 1983." *Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 122 (2d Cir. 2004)  He only asserts in an entirely unsupported conclusory fashion that "Defendants Doyle, Rein, McCready, and Kosciuk hid this exculpatory evidence."

He then further states without any basis, that "Detective McCready, as lead detective on the Tankleff case, *would* have been informed by the detectives who had attended of any findings or results from the medical examiner."   The plaintiff then draws the unsupported conclusion that Detective McCready must have known of the statement of Dr. Adams and then willfully withheld, this information from the prosecutors.

The defendant's respectfully refer the Court to the deposition testimony of Dr. Vernard Adams, at pgs. 191-193. (Annexed as Exhibit BBB).  A close reading of this portion of the Doctor's testimony reveals that, he "could have said something" about the knife, or he "could have said nothing."   He further states, that while it's a reasonable "supposition" that he communicated information about the knife to the detectives, he does not have any "recollection of what we actually communicated."

The defendants submit that, the very foundation for the alleged *Brady* violation, that the medical examiner "told the homicide detectives that there was no reasonable possibility that the watermelon knife was the murder weapon" is simply not supported by any evidence in the available record, including the deposition testimony of Dr. Adams.

Moreover, the defendants have submitted evidence, by way of sworn affidavits from all of the detectives referenced in the amended complaint, that they never were told by Dr. Adams that there was no reasonable possibility the watermelon knife could have been used in the crime. The defendants have carried their burden to show the absence of a genuine factual issue concerning the plaintiff's claim that Dr. Adams communicated exculpatory information to an unnamed detective, and that that information was then withheld, and the plaintiff's may not rely on conclusory allegations or unsubstantiated speculation to rebut this evidence.    Accordingly, plaintiff's Brady claim must be dismissed.

### ***Brady material was not suppressed***

Even assuming *arguendo* Dr. Adams told an unnamed or identified detective  that there was no reasonable possibility that the watermelon knife was the murder weapon, and that information was communicated to Detective McCready, and that Detective McCready willfully withheld that information from the prosecuting attorneys,  it cannot be said there was a Brady violation as the evidence was not suppressed.

"Evidence is not considered to have been suppressed within the meaning of the <u>Brady</u> doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that exculpatory evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006), *see also*, *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted); *McIntosh v. Conway*, 2014 WL 502735 (S.D.N.Y 2014); *Accord U.S. v. Zagari,* 111 F.3d 307, 320 (2d Cir. 1997) (no *Brady* violation where defense counsel knew of the existence of the evidence, which was equally available to defense counsel, but chose not to pursue

it); *U.S. v. Middlemiss*, 217 F.3d 112, 123 (2d Cir. 2000) (because defendants were already aware of the allegedly exculpatory evidence, they suffered no *Brady* violation). The prosecution's obligation to disclose exculpatory or impeaching information under *Brady* is limited to that information which is then known to the prosecution. *U.S. v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996). *Brady* does not place any burden on the government to conduct a defendant's investigation or assist in the presentation of the defense's case. *East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995). Further, there is no due process requirement that the prosecution use any particular investigatory tool or perform any additional forensic testing. Smith v. Edwards, 2000 WL 709005*6 (S.D.N.Y. 2000), citing *Arizona v. Youngblood*, 488 U.S. 51, 58-59 (1988).

Plaintiff's criminal attorney has testified he knew that the confession attributed to the plaintiff included the use of the watermelon knife in the killings, that the knife was recovered from the scene and tested, that the forensic testing recovered no blood on the knife, that autopsies were conducted on both Mr. and Mrs. Tankleff by Dr. Adams, he and was aware of the autopsy findings by Dr. Adams. He also testified that he would have received the medical examiners records through criminal discovery prior to commencement of the trial. Notwithstanding this knowledge, Mr. Gottlieb did not attempt to speak with the Dr. Adams, nor did he explore the issue of the possibility of the knife being excluded during cross-examination of the doctor.

The Office of the Medical Examiner in New York is, by law, independent of and not subject to the control of the officer of the prosecutor and is not considered a law enforcement agency. *People v. Washington*, 86 N.Y.2d 189 (1995). The opinions or conclusions of the medical examiner regarding whether the watermelon knife could or could not be involved in the crime were equally available to the criminal defendant as the prosecutor. Indeed, in his deposition testimony, Dr. Adams made it clear that it was his policy as well as that of the Chief Medical Examiner of Suffolk County at the time, Dr. Hirsch, that if a defense attorney asked to

speak with the medical examiner and look at the entire file, it would have been allowed. (See Deposition of Dr. Adams at 197).

Mr. Gottlieb testified that he did not speak to Dr. Adams because in his experience a request to do so would have been referred to the prosecutor.   He also claims that he chose not to explore the issue with Doctor Adams during cross-examination as a trial strategy. Notwithstanding his reasons for failing to speak to Dr. Adams, or engage him during cross-examination, it still remains clear that Mr. Gottlieb either knew, or should have known, of the essential facts permitting him to take advantage of that exculpatory evidence.    As such, no Brady violation occurred with respect to the allegation that Dr. Adams told the investigating detectives that there was no reasonable possibility that the watermelon knife was the murder weapon.

### *Statute of Limitations*

Plaintiff's new Brady claim is also barred by the applicable statute of limitations. In New York, federal courts apply a three-year statute of limitations period to § 1983 claims. *Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 151 (2d Cir.1999). The statute of limitations begins to run from the date on which "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (internal quotation omitted). A plaintiff has reason to know of the basis for the cause of action when by the exercise of reasonable diligence it should have been discovered. *See id.* at 1157.

Plaintiff's claim accrued at the time he suffered the alleged constitutional violation, which would have been during his prosecution and trial in 1990.  Even assuming his claim accrued on June 22, 2008 (the date his case was dismissed), he would have had to bring his claim by June 22, 2011.  Further the plaintiff cannot argue a delayed accrual as he knew or had reason to know of

the alleged injury and could have discovered the basis for the Brady violation with the exercise of reasonable diligence.   It is an understatement to say that the plaintiff hasn't exhausted voluminous resources during his appeal processes and throughout the litigation of this claim.   As noted above, Doctor Adams was a witness available to be spoken to by both prosecutor and defense attorney alike, as well as by plaintiff's counsel in his civil claim.    Indeed, plaintiff admits that his attorney, Barry Scheck, Esq. spoke with Doctor Adams at a time prior to his deposition.    Accordingly, plaintiff's Brady claim must be dismissed as it is barred by the applicable statute of limitations.

## CONCLUSION

Based upon the foregoing, defendants Retired Detective K. James McCready, Retired Detective Norman Rein, Retired Detective Charles Kosciuk, Detective Robert Doyle, Retired Detective Lieutenant John McElhone, and the County of Suffolk respectfully request that the Court grant its partial motion for Summary Judgment pursuant to Fed.R.Civ P. Rule 56.

Dated:  Hauppauge, New York          Yours, etc.
       January 15, 2016

                                        DENNIS M. BROWN
                                        SUFFOLK COUNTY ATTORNEY
                                        Attorney for Defendants
                                        H. Lee Dennison Building
                                        100 Veterans Memorial Highway
                                        P.O. Box 6100
                                        Hauppauge, New York  11788

                          By:   _____

                                        Brian C. Mitchell
                                        Assistant County Attorney